J. A18001/15

2015 PA Super 201

COMMONWEALTH OF PENNSYLVANIA   :      IN THE SUPERIOR COURT OF
                                 :               PENNSYLVANIA
             v.            :
                                 :
DARRIN ORLANDO MATHIS,      :        No. 2099 MDA 2014
                                 :
           Appellant     :

Appeal from the Judgment of Sentence, November 25, 2014,
in the Court of Common Pleas of Dauphin County
Criminal Division at No. CP-22-CR-0000174-2014

BEFORE: FORD ELLIOTT, P.J.E., STABILE AND MUSMANNO, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:        **FILED SEPTEMBER 22, 2015**

Darrin Orlando Mathis appeals from the judgment of sentence entered on November 25, 2014, in the Court of Common Pleas of Dauphin County following his conviction for possession of a firearm by a prohibited person,[1] small amount of marijuana,[2] and possession of drug paraphernalia.[3] In this appeal, we are asked to determine if a state parole agent is legally authorized to detain, question, and perform a protective frisk of a person, other than the parolee, who was present during a routine check of the

---

[1] 18 Pa.C.S.A. § 6105(a)(1).

[2] 35 P.S. § 780-113(a)(31).

[3] 35 P.S. § 780-113(a)(32).

parolee's approved residence when the parole agent has a reasonable suspicion that the person is armed and dangerous.

On December 2, 2013, at approximately 8:00 p.m., Michael Welsh and Gregory Bruner, agents for the Pennsylvania Board of Probation and Parole, conducted a routine parole check of parolee Gary Waters at 2503 Agate Street, Harrisburg, Pennsylvania. Agent Welsh described the area as a "high crime, high drug area." (Suppression hearing transcript, 7/28/14 at 4-5.) Agent Welsh had supervised Waters on and off since 2010 and had made several previous parole checks at this approved residence.

Upon arrival, Agent Welsh made contact with Waters and was invited into the residence. Agent Welsh testified that when he got to the door, there was a strong odor of marijuana, and he noticed the smell of marijuana increasing as he went throughout the house. (*Id.* at 7.) Appellant was seated in the kitchen and Waters, a barber by trade, was giving him a haircut. Waters introduced Agent Welsh as his parole officer. Agent Welsh then took Waters into the center room, talked to him about the marijuana, and placed Waters in handcuffs. (*Id.* at 7-8.)

In the meantime, while Agent Welsh dealt with Waters, Agent Bruner maintained visual eye contact on appellant. As Agent Welsh was speaking to Waters, Agent Bruner said, "hey, Mike. He came over, got my ear real quick" and said that appellant "was now standing in the kitchen on his cell phone pacing back and forth. Said he seemed pretty nervous." (*Id.* at 9.)

Agent Welsh then went to the kitchen to "establish some type of rapport with [appellant]." (*Id.*) Agent Welsh asked appellant to put away his cell phone. Appellant was compliant but "was still kind of moving around a little bit." (*Id.*) Agent Welsh said, "hey, I want to get you out of here as soon as I possibly can. Could you do me a favor, grab your personal belongings and come to the front room." (*Id.* at 10.) Agent Welsh "wanted to have everybody in a centralized location so [he] could maintain a visual on everyone." (*Id.* at 10.) Agent Welsh explained that it is typical for agents to check all individuals in the residence for warrants to see if they are wanted persons and to know with whom parolees are associating since it is a violation to be with persons convicted of drug or gun offenses. (*Id.* at 23.)

Agent Welsh noticed a green jacket on the bench beside appellant. Agent Welsh testified, "It was kind of funny how he picked it up." (*Id.* at 10.) Instead of putting the jacket on, appellant "real gently placed a hand underneath the jacket and over top of the jacket and kind of held it up to his body like it was a football" and was "holding this thing like it was a baby . . . being real gentle with it." (*Id.* at 10-11.) Agent Welsh testified that "kind of raised some concerns with me, that and his nervous demeanor at the time." (*Id.* at 11.) Agent Welsh described the situation:

> [A]s I had him walking out there, he was protecting, he, like, had a protecting type of grip over top this jacket. And I was thinking, this isn't right. Maybe he's trying to remove contraband from my offender's house, maybe he has something that

could be unsafe to my partner or my offender that's sitting in the front room.

As he was walking around, he was kind of turning away from me. At that point in time, whenever he was passing me when I was in the -- what would be the formal dining room, I guess, right before the living room, I noticed that there was a bulge in it.

And I kind of just reached out -- well, I asked him. I'm like, hey, hold on a second bud, I need to pat you down. I'm a little concerned with the way you're acting. He told me he did not feel comfortable with me patting him down and pulled the jacket closer to his body.

At that point, I noticed the bulge in the jacket, reached out just to touch it. Felt it, what I felt to be an identifiable handle of a firearm.

*Id.* at 11-12.

Agent Welsh's initial thought was, "Oh, [expletive] I just grabbed a gun by the handle." (*Id.* at 36.)

Next, Agent Welsh "grabbed [the jacket] pretty forcefully" to try and pull it away from appellant. Appellant pulled back on it. Agent Welsh pulled once again and threw it down to the floor behind him. (*Id.* at 12.) Agent Welsh illuminated his Taser on appellant[4] and instructed appellant to put his hands behind his back. Appellant complied and was handcuffed.

---

[4] Agent Welsh did not "tase" appellant. He only illuminated him with the light to make the presence of the taser known, in order to gain immediate compliance, at which time appellant was compliant. Appellant did not need to be tased. (*Id.* at 13.)

Agent Bruner walked over to the jacket and confirmed the presence of a firearm. (*Id.* at 12-14.)

Agent Welsh told appellant to sit on the couch. A pat-down search did not reveal any further contraband. Agent Welsh noticed a bag of marijuana on the floor in between appellant's feet. (*Id.* at 13-14.) Agent Welsh called police dispatch for assistance. Officer Allison Shuff of the Harrisburg City Police Department arrived on the scene. Appellant was read his *Miranda* rights and agreed to speak without an attorney. (*Id.* at 40.) Appellant claimed ownership of the firearm and the marijuana. Officer Shuff collected the firearm for evidence, which contained a magazine and a round in the chamber. (*Id.* at 41.) Officer Shuff ran appellant's criminal history and found he was a person not to possess a firearm due to prior charges.

Appellant moved to suppress evidence on June 18, 2014. A suppression hearing was held on July 28, 2014. The trial court denied appellant's suppression motion on October 29, 2014.[5]

---

[5] Apparently, due to emergency health reasons, the suppression court did not enter findings of fact or conclusions of law on the record at the conclusion of the suppression hearing in accordance with Pa.R.Crim.P. 581(I). Furthermore, the court did not file a Rule 1925(a) opinion. However, in these particular circumstances, this poses no substantial impediment to our meaningful and effective appellate review. It is abundantly clear that the suppression court credited Agent Welsh's version of events and concluded that Agent Welsh had a reasonable basis to detain and frisk appellant. We have carefully reviewed the suppression hearing transcript and note that appellant presented no uncontradicted evidence. Further, the question concerning the scope of the power and authority of state parole agents is a pure question of law. As with any question of law,

A stipulated bench trial was held on November 25, 2014, after which appellant was found guilty. He was sentenced the same day to an aggregate term of 32 to 64 months in a state correctional institution.

On appeal, appellant argues that there is no statutory authority conferred on state parole agents to question or perform an investigative detention of non-parolees or guests of parolees. He asserts that Section 6153 of the Prisons and Parole Code, 61 Pa.C.S.A. § 6153, authorizes state parole agents to detain and conduct searches of their parolee only. He argues that Agent Welsh had no authority to interact with him in any capacity because he was not a parolee. He contends that the discovery of the marijuana, paraphernalia, firearm, and his admission were all illegally obtained and should have been suppressed. Appellant also argues that, assuming *arguendo,* Agent Welsh had some authority over him, Agent Welsh lacked reasonable suspicion to conduct a *Terry*[6] frisk in violation of the Fourth Amendment.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth

---

our review of the trial court's decision is plenary and *de novo*. *West Mifflin Area Sch. Dist. v. Zahorchak*, 4 A.3d 1042, 1048 (Pa. 2010).

[6] *Terry v. Ohio*, 392 U.S. 1 (1968).

prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review. *Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (citations, quotations, and ellipses omitted). Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. *See In re L.J.*, 79 A.3d 1073, 1083-1087 (Pa. 2013).

State parole agents are employed by the Pennsylvania Board of Probation and Parole. The Prisons and Parole Code sets forth the authority of state parole agents. Section 6152 of the Prisons and Parole Code declares parole officers to be "peace officers" and gives them limited police power and authority to arrest, without warrant, parolees under the supervision of the Parole Board.

> **6152. Status as peace officers.**
>
> An agent is declared to be a peace officer and is given police power and authority throughout this Commonwealth to arrest without warrant, writ, rule or process **any parolee or probationer under the supervision of the board** for failing to report as required by the terms of his probation or parole or for any other violation of the probation or parole.

61 Pa.C.S.A. § 6152 (emphasis added).

Section 6153 of the Prisons and Parole Code sets forth the bounds in which parole agents may search offenders:

**6153.  Supervisory relationship to offenders**

**(a)  General rule.**--Agents are in a supervisory relationship with their offenders.  The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public. Supervision practices shall reflect the balance of enforcement of the conditions of parole and case management techniques to maximize successful parole completion through effective reentry to society.

**(b)  Searches and seizures authorized.**--

(1)  Agents may search the person and property of **offenders** in accordance with the provisions of this section.

(2)  Nothing in this section shall be construed to permit searches or seizures in violation of the Constitution of the United States or section 8 of Article I of the Constitution of Pennsylvania.

**(c)  Effect of violation.**--No violation of this section shall constitute an independent ground for suppression of evidence in any probation or parole proceeding or criminal proceeding.

**(d)  Grounds for personal search of offender**.--

(1)  A personal search of an **offender** may be conducted by an agent:

(i) if there is a reasonable suspicion to believe that the **offender** possesses contraband or other evidence of violations of the conditions of supervision;

(ii) when an **offender** is transported or taken into custody; or

(iii) upon an **offender** entering or leaving the securing enclosure of a correctional institution, jail or detention facility.

(2) A property search may be conducted by an agent if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision.

(3) Prior approval of a supervisor shall be obtained for a property search absent exigent circumstances. No prior approval shall be required for a personal search.

(4) A written report of every property search conducted without prior approval shall be prepared by the agent who conducted the search and filed in the offender's case record. The exigent circumstances shall be stated in the report.

(5) The **offender** may be detained if he is present during a property

search. If the offender is not present during a property search, the agent in charge of the search shall make a reasonable effort to provide the offender with notice of the search, including a list of the items seized, after the search is completed.

(6) The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observations of agents.

(ii) Information provided by others.

(iii) The activities of the **offender**.

(iv) Information provided by the **offender**.

(v) The experience of agents with the **offender**.

(vi) The experience of agents in similar circumstances.

(vii) The prior criminal and supervisory history of the **offender**.

(viii) The need to verify compliance with the conditions of supervision.

61 Pa.C.S.A. § 6153 (emphasis added).

The Prisons and Parole Code speaks in terms of the parole agent's police power and authority with respect to the supervision of his parolees, probationers, and/or offenders only. It gives parole agents all of the powers of a police officer with respect to offenders under their jurisdiction. The Prisons and Parole Code does not empower parole agents to act as police officers with respect to non-offenders or private citizens.

In **Commonwealth v. Scott**, 916 A.2d 695 (Pa.Super. 2007), **appeal denied**, 937 A.2d 445 (Pa. 2007), this court reviewed the scope of a county probation officer's police power and authority over a private citizen under the 1941 Parole Act, formerly 61 P.S. § 331.27.[7]

In **Scott**, Jonathan Scott visited the home of his uncle, Mark McDowell, an offender serving probation. When he arrived, two Northumberland and Union County probation officers were waiting at the door to conduct a routine home visit. Scott knocked on the door, which caused it to open. Scott entered the home, and the probation officers followed. Scott then picked up a black bag that belonged to him and was leaving the home when one of the probation officers commanded him to stop. **Scott**, 916 A.2d at 697. The probation officers then questioned Scott about the bag, asking him

---

[7] Former § 331.27 of the 1941 Parole Act went into effect January 16, 1996, and is now codified at 61 Pa.C.S.A. § 6152 and § 6153 (the Prisons and Parole Code).

who it belonged to, and whether they could look inside. Scott stated that the bag was his and he refused their request to open it. *Id.* The probation officers stated that they had a right to look into the bag because it came from an offender's residence. Believing the probation officers had authority to search the bag, Scott handed it to them. The probation officers opened the bag to discover marijuana and scales. *Id.*

The trial court granted suppression, finding the probation officers' claim of authority was false as the probation officers only possessed statutory authority to search the uncle. This court affirmed and held that the probation officers possessed police power and authority only as to offender McDowell, and none as to Scott. Scott was "a private citizen not subject to any supervisory authority of the probation officers. They had no right to interact with him in any official capacity." *Id.* at 697-698. This court explained:

> [U]nless there are exigent circumstances, none of which existed here, a search of McDowell's residence must have been supported by reasonable suspicion that 'the real or other property in the possession of or under control of the offender contains contraband or other evidence of violations of the conditions of supervision.' That is to say, if there had been evidence McDowell was under supervision for a drug offense, then perhaps the officers would have had reasonable suspicion for the search, but they still would have needed a supervisor's approval absent exigent circumstances. Here, no such suspicion existed; in fact, Officer Yasenchak testified his sole purpose for being at McDowell's residence was to conduct a routine home visit, and Officer Kerstetter testified he went along on the 'spur of the moment.'

> Even if one were to concede the officers had the 'right' to conduct a **Terry** stop, which this Court specifically denies, the officers had no reasonable basis (suspicion) upon which to detain [Scott]. Once the bag was removed from the premises by [Scott], the officers had no authority to detain [Scott], search the bag that he removed from McDowell's residence, or do anything other than perhaps call the police on McDowell's behalf, if they believed the bag was being stolen. **No evidence was presented to suggest the officers believed [Scott] to be armed and dangerous, warranting a search for their protection**.

**Id.** at 698 (emphasis added) (citations and footnote omitted).

At first glance, **Scott** appears to control. However, because the case at hand involves a factual scenario which is measurably different than in **Scott**, we hesitate to apply **Scott** summarily without further analysis.

In **Scott**, there were no "exigent circumstances" which justified a search of McDowell's residence or the bag.[8] The officers had no reasonable basis to suspect that the bag contained contraband or other evidence of

---

[8] Absent exigent circumstances, a "property" search may be conducted by an agent with prior approval from his supervisor if there is reasonable suspicion to believe that the real or other property in the possession or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision. 61 Pa.C.S.A. § 6153(d)(2).

Parole officers are authorized to "arrest without warrant, writ, rule or process any parolee or probationer under the supervision of the board for failing to report as required by the terms of his probation or parole or for any other violation of the probation or parole." 61 Pa.C.S.A. § 6152.

A "personal" search of an offender may be conducted by an agent if there is reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision. 61 Pa.C.S.A. § 6153(d)(1).

violations of the conditions of McDowell's supervision. Having no right to conduct a search of the bag, the probation officers had no legal basis to detain Scott, ask to inspect the bag, or prevent him from removing the bag from the residence. Further, as the *Scott* court pointed out, there was no evidence that the probation officers believed Scott to be "armed and dangerous" which would have warranted a search of the bag "for their protection." *Id.* at 698.[9]

Here, Agent Welsh's contact with appellant involved an investigative detention and protective frisk based on his belief that appellant had something that was unsafe to his partner and Waters. The *Scott* court plainly left unsettled the situation where, as here, a parole officer, while performing his official duties in an offender's home, encounters a person, other than the parolee, whom the parole agent reasonably believes might be armed and dangerous. In fact, the *Scott* court leaves open the possibility that in some limited "exigent" circumstances, a frisk may be warranted.

---

[9] Appellant also relies on *Commonwealth v. Dobbins*, 934 A.2d 1170 (Pa. 2007), as another example of a "person in a non-police authoritative position." (Appellant's brief at 20.) In *Dobbins*, our supreme court concluded that absent specific statutory authorization, sheriffs lacked authority to conduct independent investigations under the Controlled Substances Act, including the seeking of search warrants where no breach of the peace or felony occurred in their presence. We find *Dobbins* to be distinguishable because it did not involve, as here, the legality of spur-of-the-moment action taken by the sheriffs to prevent the removal of contraband from the residence and/or minimize their risk of harm.

Unfortunately, there is little guidance in the way of published law in this Commonwealth. However, we find instructive the decisions of courts in other jurisdictions that have considered this question. In **Ohio v. Barnes**, 1996 WL 501464 (Ohio App. 2 Dist. 1996),[10] two parole officers visited the home of Henry Harris for the purpose of arresting Harris for violations of the conditions of his parole. Kyle Barnes was in a bedroom with Harris on the second floor of the home. The parole officers immediately arrested Harris. The parole officers noticed that Barnes was behind a dresser, wearing a waist-length coat on a warm day. The parole officers also noticed that Barnes' hands were concealed from view, and he avoided eye contact. The parole officers asked Barnes to step aside so they could search the area where Barnes stood. Barnes moved aside, removed his hands from his pockets, and began moving towards the parole officers. One parole officer told Barnes that he was going to have to pat him down for the parole officers' own safety. Before the parole officers could pat him down, Barnes admitted to having a gun, withdrew a .38 caliber revolver, and placed the gun on a dresser. The parole officers then handcuffed Barnes and placed

---

[10] While **Barnes** was an unpublished decision, it has since been accepted as the law in Ohio. **See Washington v. Department of Rehabilitation and Correction**, 853 N.E. 2d 372 (Ohio App. 2006); **Washington v. Ohio Department of Rehabilitation and Correction**, 2004 WL 1945675 (Ohio App. 2004) (parole officer has authority to search a third party when arresting a parolee while the third party is present at the time of the arrest if parole officer has a reasonable suspicion that her safety and safety of the other officers present is in danger).

him in a chair until Dayton police arrested him. After he was convicted of various firearm offenses, Barnes appealed. Barnes challenged the parole officers' legal authority to detain a non-parolee. He argued that under Ohio Revised Code, RC 2967.15, parole officers were law enforcement officers for the limited purpose of exercising their statutory authority to arrest parole violators. The issue before the court was whether the parole officers possessed some "ancillary authority" to pat down and arrest Barnes in the course of arresting Harris, who was a known parole violator. The Ohio appeals court held that the parole officers possessed a legal basis to demand to pat down Barnes.

The Ohio appeals court held that the parole officers' *Terry* frisk of Barnes was supported based on the confined space the officers were working in, drugs in extremely close proximity to the third party, his demeanor, the parole officers' inability to see his hands, unusual attire (a coat on a warm day), and his movement towards one parole officer. The court explained:

> Under these circumstances, we believe the officers possessed a reasonable fear for their safety and a reasonable suspicion that Barnes might be armed. Consequently, in addition to their statutory authority to arrest Harris, we believe they also possessed the ancillary authority to conduct a weapons frisk of Barnes. Indeed, it would be anomalous to hold that parole officers may carry weapons like peace officers, place themselves in peril like peace officers, yet not protect themselves in the face of apparent dangers. Thus, in the context of their limited statutory authority to arrest parole violators, we hold that parole officers possess the concomitant authority to conduct a weapons frisk of a

- 16 -

> non-parolee when the facts and circumstances would warrant a reasonably prudent peace officer in doing the same.

*Id.*

With regard to the parole officers' arrest of Barnes, the Ohio appeals court held that despite the limited statutory authority to arrest parole violators, the parole officers possessed the authority, along with any private person, to conduct a warrantless arrest when they have reasonable grounds to believe that a felony has been committed. "At that point, the parole officers possessed the same authority as any other person to place Barnes under 'citizen's arrest.'" *Id.*

In *People v. Rios*, 122 Cal.Rpt.3d 96 (5th Dist. 2011), a juvenile probation officer acted within his authority as a peace officer to enforce conditions of probation when he detained and patted down an individual who was present in a probationer's house. There, six probation officers went to a probationer's residence to conduct a routine home visit of a high risk juvenile probationer. The probationer was subject to gang and drug probation conditions. When the probation officers entered the home, they observed Florencio Rios sitting on the couch. Rios had what reasonably appeared to be visible gang tattoos on his face and hand. When the probation officers asked Rios his name and why he was at the residence, Rios was evasive and belligerent. Given the heat of the day, the probation officers found it unusual that Rios was wearing layers of clothing. *Id.* at

101. As one probation officer moved in front of Rios, Rios turned his body away and leaned forward slightly. Each time the probation officer took a step further in front of him, Rios leaned forward farther, pushing his right forearm against his waist and turning his shoulder away from the officer. *Id.* at 102. Based on everything he noticed, including Rios' clothing, evasiveness, and mannerisms, the probation officer believed Rios was trying to hide a weapon. He asked Rios to stand up so he could pat him down. Rios resisted. Believing Rios had a weapon, and concerned for his safety and that of the other officers, the probation officer and another officer forced Rios to the ground and handcuffed him. Officers found a loaded gun and a switch blade on Rios.

At the suppression hearing, Rios argued that he could not be lawfully detained merely because he was a visitor in a probationer's home. The California court of appeals disagreed and found that once probation officers were lawfully on the premises, it was reasonable for the officers to determine whether the probationer's association with Rios was a probation violation. Next, Rios argued that the search of his person was illegal because under Section 830.5 of the California Penal Code, the probation officers' "peace officer powers" extended only to the juvenile probationer. The California appeals court, relying on *Terry*, first held that the probation officers acted reasonably under the circumstances in performing the pat-down of Rios to determine if he was armed and dangerous. The court

- 18 -

also found that the probation officers were acting within the scope of their authority under Section 830.5(a)(1) of the Penal Code when they encountered Rios, and "[t]his authority included the right to detain Rios and, under the situation as it developed, to frisk him for weapons." *Id.* at 110. The court reasoned:

> [T]o hold otherwise would mean that juvenile probation officers could not detain or investigate anyone on the same premises as the juvenile probationer, no matter the circumstances or officer safety issues unless they were accompanied by police or other law enforcement officers. We decline to give section 830.5 subdivision (a) such a limited, unreasonable reading.

*Id.*

In *State v. Jones*, 78 So.3d 274 (La. App. 2011), two probation and parole officers went to a residence to arrest Sharon Evans for absconding from probation supervision. As the probation and parole officers walked down the hallway, they encountered Ernest Jones leaving a bathroom. One officer discovered a .22 rifle in a closet and informed the other officer who had remained with Jones. Jones was handcuffed for safety reasons. Prior to patting Jones down, the parole officer asked Jones if he had any weapons. Jones denied having weapons but admitted to having narcotics. Jones was later convicted of possession with the intent to deliver. On appeal, Jones challenged the denial of his motion to suppress. Jones argued that the probation and parole officers did not have the authority to interrogate,

detain, handcuff, and search him because he was not a probationer or parolee being supervised by those probation officers. *Id.* at 280.

On appeal, the Louisiana court of appeals affirmed. Noting that law enforcement officers should not be required to take unnecessary risks in performing their duties, the court held that due to safety concerns the probation officer was justified in handcuffing Jones once the other officer alerted him that a gun was found.

We find these cases persuasive, especially the court's reasoning in **Barnes**. Our state and federal courts have consistently acknowledged the dangers facing police officers during execution of search warrants and have sanctioned their ability to conduct a **Terry** frisk of nonresident visitors (not named in the warrant) to insure officer safety. **Ybarra v. Illinois**, 444 U.S. 85 (1979); **Commonwealth v. Eichelberger**, 508 A.2d 589 (Pa.Super. 1986), **alloc. denied**, 531 A.2d 427 (Pa. 1987); **Commonwealth v. Luddy**, 422 A.2d 601 (Pa.Super. 1980). Pennsylvania has also embraced a rule which permits a police officer, during an arrest, to (1) briefly detain and direct the movement of an "arrestee's companion" regardless of whether a reasonable suspicion exists that the companion is involved in criminal activity; and (2) conduct a pat-down search of the companion if the officer has a reasonable and articulable suspicion that the arrestee's companion is armed and dangerous. **Commonwealth v. Graham**, 685 A.2d 132 (Pa.Super. 1996), **rev'd on other grounds**, 721 A.2d 1075 (Pa. 1998).

*See also*, *In re N.L.*, 739 A.2d 564 (Pa.Super. 1999) (an arrestee's companion may be stopped and frisked by a police officer when there is reasonable suspicion that the companion is armed and dangerous).

Within the context of their limited statutory authority over parolees, we must recognize a parole officer's concomitant authority to conduct a weapons frisk of a non-parolee when the facts and circumstances would warrant a reasonably prudent police officer in doing the same. Parole agents face the same extreme safety risks as police officers, and routinely encounter persons other than the parolee, who are present during an arrest and/or search of an approved residence. It is irrational to presume that a parole agent will only ever encounter his parolee during an arrest or home visit. We believe that while a parole agent is performing his official statutory duties, he is entitled to the same protections this Commonwealth has afforded to police officers with respect to his interaction with third parties, other than the parolee. Accordingly, we conclude that a parole agent's statutory authority to detain and arrest parolees includes the ancillary authority to conduct a weapons frisk of any person present, during an arrest or home visit, where the parole agent has a reasonable suspicion that a person searched may be armed and dangerous.

Appellant contends that, even assuming *arguendo*, Agent Welsh had some authority over him, Agent Welsh did not have "reasonable suspicion"

that appellant was armed and dangerous to warrant a **_Terry_** frisk.[11]

Appellant asserts that he was subjected to an illegal frisk of his jacket based on Agent Welsh's "hunch" or "unparticularized suspicion" that he was either removing drugs **_or_** concealing a weapon. Appellant contends that Agent Welsh saw a bulge in appellant's jacket; however, he did not **necessarily** know it was a firearm. Agent Welsh testified,

> Q.    And what made you think it was a firearm?
>
> A.    I didn't necessarily know it was a firearm. It was some kind of contraband. There was something inside the jacket. I could tell there was a shape inside of that jacket. I didn't want him removing contraband and/or weapons from that house, and I did not want him taking a potential weapon where I had unaware people, like my partner, and Mr. Waters.

---

[11] Appellant also claims that his "mere presence" during the routine parole visit was an insufficient ground, in and of itself, for a protective pat-down. **_Ybarra_**; **_Appeal of J.V._**, 762 A.2d 376 (Pa.Super. 2000) (police executing a search warrant for drugs at a residence may not perform a pat-down for weapons on anyone merely present on the premises. Where the warrant does not authorize the search of the individual, police must be able to cite specific facts establishing a reasonable belief that the individual was armed and dangerous to legitimize a **_Terry_** frisk). He argues that Pennsylvania courts have rejected the "guns follow drugs" justification for protective sweeps for weapons. **_Commonwealth v. Grahame_**, 7 A.3d 810 (Pa. 2010). In **_Grahame_**, the court held that a police officer lacked reasonable suspicion to conduct a warrantless search of a woman's handbag for safety reasons based solely on the fact that she was present inside a residence in which another individual had been selling drugs approximately ten minutes earlier. There, the officers did not detect any unusual behavior or furtive movements on the woman's part nor did they observe a suspicious bulge in the purse. While **_Grahame_** stands for the principle that a companion may not be "automatically" patted down, appellant was not detained and frisked merely because he was present at Waters' approved residence getting a haircut.

Suppression hearing transcript, 7/28/14 at 13.

First, Agent Welsh did not place his hand on appellant's jacket based solely on his observation of the "bulge." Agent Welsh testified that, **even before he saw the bulge**, he thought appellant "possibly could have been armed" or trying to remove other contraband from his parolee's residence. (Suppression hearing transcript, 7/28/14 at 11, 35.) Agent Welsh testified that he did not intend to conduct a pat-down of appellant "until appellant started getting nervous. Whenever he started holding that jacket like it was a baby, I knew through my experience, through observing people's demeanors over my years of experience that something was not right." (***Id.*** at 31.)

In any event, Agent Welsh did not need to be absolutely certain that the bulge was a gun to believe that his safety or the safety of others was in danger. Although a weapons frisk must be strictly circumscribed by the exigencies that justify it, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." ***Terry***, 362 U.S. at 27. ***Commonwealth v. Mesa***, 683 A.2d 643 (Pa.Super. 1996) (police may pat down for weapons as safety precaution and may investigate bulge in clothing to see if it is a weapon); ***see also People v. Miles***, 242 Cal.Rptr. 107, 110 (1987) (officer had reasonable suspicion to conduct pat-down search when he saw an

"exaggerated bulge" in defendant's left jacket pocket and the manner in which the jacket swung, the officer "knew it was some type of heavy object, possibly a gun"); *Byrd v. United States*, 579 A.2d 725, 729 (D.C. 1990) (officer had reasonable grounds to frisk defendant upon seeing a bulge in defendant's pocket which officer thought could possibly be a gun).  *See also Commonwealth v. Cortez*, 491 A.2d 111, 113 (Pa. 1985), *cert. denied*, 474 U.S. 950 (1985) ("We cannot demand of our police that they determine with one hundred percent certainty that criminal activity is afoot or that a person is armed before they take protective steps").  We do not agree with appellant that this was a situation, as in *Stanley v. Commonwealth*, 433 S.E.2d 512, 515 (Va. App. 1993), where the officer conducted a frisk based on some amorphous, unidentifiable bulge in the defendant's clothing, absent any other circumstances which reasonably supported the conclusion that the defendant was armed and dangerous.  *See also People v. Howard*, 542 N.Y.S.2d 536, 539 (1989) (the mere observation of an undefinable bulge in a person's pocket is insufficient as a basis for a frisk or search) (citations omitted), *appeal dismissed*, 549 N.E.2d 477 (1989).  Agent Welsh testified that he had concerns for his safety after he observed appellant's nervous demeanor and furtive behavior with the jacket.  Agent Welsh observed appellant pick the jacket up very gently and protectively with one hand under the jacket and one hand on top.  Appellant acted nervously and evasively by turning away from Agent Welsh and holding the jacket against

his side like a football as he was walking into the center room. That is when Agent Welsh first saw the bulge. We believe that a reasonably prudent officer in these circumstances would be warranted in the belief that his safety or that of others was in danger, warranting a **Terry** search for his protection.[12]

The suppression court did not err when it denied appellant's omnibus pretrial motion to suppress.[13]

The judgment of sentence entered on November 25, 2014, is affirmed.

---

[12] Appellant asserts that "[w]ith respect to the 'shape' in Appellant's jacket, Agent Welsh testified, 'I had a change of heart where, like, I'm doing something wrong here, something is not right, I need to stop this.'" (Appellant's brief at 11.) Appellant intimates that Agent Welsh's statement that he was "doing something wrong" related to his decision to frisk appellant. However, Agent Welsh's statements were in reference to allowing appellant to walk into the front room unchecked. (Suppression hearing transcript, 7/28/14 at 33.)

[13] We leave open the question whether the agents had sufficient ancillary authority under the facts of this case to search appellant's coat for evidence of contraband. Unlike in **Scott**, Agents Walsh and Bruner smelled a strong odor of marijuana upon entering the residence and therefore could arrest Waters immediately. Whether they could also search the residence and items found therein would require a separate finding of exigent circumstances absent a supervisor's prior approval for a residence search. This issue is not before us nor is the question of whether the presence of appellant within the residence would subject him to a search for any concealment of contraband. We decide only that appellant was subject to a protective **Terry** search based on the reasonable suspicion of Agent Welsh.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/22/2015</u>