J-A07024-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PATRICK CHURILLA | |
| Appellant | No. 690 WDA 2015 |

Appeal from the Judgment of Sentence April 22, 2015
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0012399-1992
CP-02-CR-0015417-1992

BEFORE:   BOWES, J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY MUNDY, J.:                    **FILED APRIL 13, 2016**

Appellant, Patrick Churilla, appeals *nunc pro tunc* from the aggregate judgment of sentence of life in prison imposed by the trial court on November 1, 1993, and, after remand from this Court, on April 22, 2015. After careful review, we affirm.

In Appellant's prior appeal, we explained as follows.

> In 1992, while incarcerated on unrelated charges, Appellant confessed to the 1990 murder, robbery, and attempted rape of a woman in the Lawrenceville section of Pittsburgh.  On one criminal information, Appellant was charged with homicide.  On a second criminal information, Appellant was charged with robbery, indecent assault, and criminal attempt to commit rape.  Because the illegal conduct charged constituted a single criminal episode, the two criminal informations were joined for trial.  On November 1, 1993, a jury convicted Appellant of first-degree murder, and he received a sentence of

life imprisonment. Also, on that date, the jury convicted Appellant of all of the charges on the second criminal information. However, sentencing on the non-homicide convictions was deferred, pending the preparation of a presentence report, and scheduled for December 13, 1993. However, both the Commonwealth and Appellant agree that sentencing in the second criminal information did not occur on December 13, 1993, or on any other date. On April 27, 1994, Appellant filed mandatory post-verdict motions[1], which the trial court never addressed.

In June of 2008, Appellant began filing *pro se* motions, which the trial court treated as PCRA petitions, and appointed PCRA counsel. Eventually, in May of 2011, appointed counsel filed an amended PCRA petition. The Commonwealth responded that Appellant's judgment of sentence was not final, that Appellant should be formally sentenced, and that his appellate rights should be reinstated. On July 14, 2011, although never having sentenced Appellant on the convictions pertaining to the second criminal information, the PCRA court entered an order reinstating Appellant's direct appeal rights.

***Commonwealth v. Churilla***, 116 A.3d 683 (Pa. Super. 2014) (unpublished memorandum at 1).

Thereafter, Appellant appealed to this Court. We quashed the appeal "because there has not been a judgment of sentence to all of Appellant's convictions, [such that] the judgment of sentence is not final." ***Id.*** at 2. The trial court summarized the ensuing procedural posture as follows.

This matter was remanded to th[e trial c]ourt by the Pennsylvania Superior Court pursuant to a

_____

[1] Pursuant to former Pennsylvania Rule of Criminal Procedure 1123.

Memorandum Opinion dated December 9, 2014. The Superior Court had determined that following his conviction for Criminal Homicide, Robbery, Indecent Assault and Criminal Attempt, though the [trial c]ourt immediately imposed sentence on the homicide count following the jury's verdict, [Appellant] was never brought back to court to be sentenced on the remaining counts. Th[e trial c]ourt was directed to permit [Appellant] to file Post-Verdict Motions and then to dispose of those motions and impose sentence on the non-homicide counts. [Appellant] did file a Post-Verdict Motion, claiming that the [trial c]ourt erred in denying the Motion to Suppress the statements that [Appellant] gave to corrections officers at the State Correctional Institution at Rockview and the subsequent statements he gave to law enforcement summoned by the corrections staff[.]

Trial Court Opinion, 6/17/15, at 2-3.

On April 22, 2015, the trial court denied Appellant's post-verdict motion, granted Appellant's motion for judgment of acquittal as to robbery, and imposed no further penalty on the remaining charges of indecent assault and attempted rape. N.T., 4/22/15, 3-4. Appellant filed this timely appeal on May 4, 2015. Although the trial court did not order compliance with Pennsylvania Rule of Appellate Procedure 1925, the trial court filed an opinion on June 17, 2015.

On appeal, Appellant presents a single issue for our review.

Whether the trial court erred in failing to suppress Appellant's statements to correction officers when Appellant was in custody and being interrogated but was not given **Miranda** warnings?

Appellant's Brief at 5.

Our review of a trial court's suppression ruling is guided by the following.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review. **Commonwealth v. Jones**, 605 Pa. 188, 988 A.2d 649, 654 (2010) (citations, quotations, and ellipses omitted). Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. **See In re L.J.**, 622 Pa. 126, 79 A.3d 1073, 1083–1087 (2013).

**Commonwealth v. Mathis**, 125 A.3d 780, 783 (Pa. Super. 2015).

In his argument, Appellant concedes that on September 4, 1992, while incarcerated at SCI Rockview on unrelated charges, he "asked Officer Donald E. Young if he could speak with Captain Charles Hall. After he was escorted to the captain's office, Appellant was questioned as to what he wanted. Appellant told Captain Hall that he killed someone in Pittsburgh, he wanted to get that off his chest, and wanted to speak with the police." Appellant's Brief at 17. Despite asking to speak with the corrections officers, Appellant

asserts that the officers "interrogated him" and he "was never properly warned pursuant to **Miranda v. Arizona**." **Id.** at 19, 25.

The United States Supreme Court has stated that "we have repeatedly declined to adopt any categorical rule with respect to whether the questioning of a prison inmate is custodial." **Howes v. Fields**, 132 S.Ct. 1181, 1187 (2012). When a prisoner is questioned, "the determination of custody should focus on all the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interview is conducted." **Id.** at 1192. The United States Supreme Court commented as follows.

> [O]ur decisions do not clearly establish that a prisoner is always in custody for purposes of **Miranda** whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison.
>
> Not only does the categorical rule applied below go well beyond anything that is clearly established in our prior decisions, it is simply wrong. The three elements of that rule—(1) imprisonment, (2) questioning in private, and (3) questioning about events in the outside world—are not necessarily enough to create a custodial situation for **Miranda** purposes.
>
> As used in our **Miranda** case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.

**Id.** at 1188-89.

Instantly, "no serious danger of coercion existed." In advancing his argument, Appellant cites **Commonwealth v. Chacko**, 459 A.2d 311 (Pa.

- 5 -

1983), to support his contention that he was subjected to a custodial interrogation, asserting that he "was in custody for purposes of **Miranda**" because "[t]he captain said he asked Appellant about what Appellant wanted, to which Appellant said that he murdered someone." Appellant's Brief at 25. Appellant further maintains that the captain "continued to interrogate Appellant as to when the murder occurred and Appellant responded that the murder could have occurred years earlier." **Id.** at 26. Appellant recognizes that the captain testified that his two purposes for questioning Appellant were to determine "1.) whether he should refer [Appellant] to the police and 2.) whether he should place [Appellant] in observation." **Id.**

Interrogation is defined as "police conduct 'calculated to, expected to, or likely to evoke admission.'" **Commonwealth v. Heggins**, 809 A.2d 908, 914 (Pa. Super. 2002), *appeal denied*, 827 A.2d 430 (Pa. 2003), *quoting* **Commonwealth v. Mannion**, 725 A.2d 196, 200 (Pa. Super. 1999) *(en banc)*. In **Chacko**, prison guards advised the appellant that the Major of the Guard wanted to see him. **Chacko**, **supra** at 313-314. When the appellant met with the Major of the Guard, the Major of the Guard asked the appellant if he was involved in a prison stabbing the day before, and the appellant replied that he had committed the stabbing. **Id.** at 314. Our Supreme Court determined that this interaction constituted a custodial interrogation which warranted **Miranda** warnings. **Id.** at 315. The facts before us in the

present case, however, are distinguishable, and not indicative of either coercion or interrogation. The trial court related the facts as follows.

> The record established that while incarcerated on unrelated charges at the State Correctional Institution at Rockview, [Appellant] summoned Correctional Officer Ronald Young to his cell and told him that he needed to speak to a [supervising corrections officer]. (N.T. 100). When asked why, he said that he wanted to confess to something he had done in Pittsburgh; that he had killed someone. (N.T. 101). According to Young, the only question he asked [Appellant] was why he wanted to see [the supervising corrections officer]. (N.T. 111).
>
> Young reported this to Captain Charles Hall who directed that [Appellant be] brought to his office. According to Captain Hall, he was told by [O]fficer Young that "…he had an inmate that [w]as pacing in his cell and claimed he had done something in Pittsburgh that he couldn't live with anymore, and he had to talk to somebody, or he was going to hurt himself bad." (N.T. 116). When [Appellant] entered, [Captain Hall] asked him what "his problem was." (N.T. 117). [Appellant] said that he needed to speak to someone with the Pittsburgh Police and, when [Captain Hall] asked him what he wanted to talk with them about, [Appellant] said that he had killed someone in Pittsburgh around Halloween, 1991. While talking to [Appellant], Captain Hall checked his records and noted that [Appellant] was incarcerated in October 1991. (N.T. 120). He asked [Appellant] about this, and [Appellant] insisted that he had killed someone and volunteered that he probably had the year wrong. (N.T. 120).
>
> Captain Hall acknowledged that he did not Mirandize [Appellant]. He explained, "I told him he didn't have to say anything to me. I didn't want to know anything about what he had done, but that if he had done something and wanted to talk to the police, that's to the extent that I wanted to know about it." (N.T. 122). Captain Hall explained further:

- 7 -

"Really, what I was looking at, primarily, was that the inmate seemed upset. He was willing to admit at that time of the night to something and said that he couldn't live with himself.

I wasn't really concerned with whether he did it whether he didn't. I was concerned that he was alive to talk to people about the situation, had he done it or he didn't do it or whatever."

N.T. 126.

Trial Court Opinion, 6/17/15, at 3-4.

Our review of the suppression hearing confirms the trial court's recitation of the facts. Corrections Officer Young testified that Appellant approached him on September 4, 1992, asking to speak with a supervisor. N.T., 10/28/93, at 101. Officer Young responded that he "couldn't call one over unless you tell me the exact reason why you need one." *Id.* Officer Young testified that prisoners ask for a supervisor "a lot," and he had "to have a pretty good reason to interrupt a [supervisor] because he's got a lot more work to do than I do." *Id.* at 110. Appellant then told Officer Young that he "had hurt someone pretty bad in Pittsburgh." *Id.* at 102. Officer Young took Appellant to see Captain Hall, and Appellant told Captain Hall he wanted to speak with the Pittsburgh Police. *Id.* at 103. When Captain Hall asked Appellant why he wanted to speak with the police, Appellant stated that "he had murdered a person in the Pittsburgh area on or about – he said 1991[.]" *Id.* Officer Young opined that Appellant "was voluntarily telling [Captain Hall] all the information he was giving him." *Id.* at 112.

- 8 -

In addition to the testimony cited by the trial court, Captain Hall testified that ultimately he told Appellant "there's nobody in the Pittsburgh police that I think would want to talk to you at this time of night [but] I'll make sure you get to talk to somebody." *Id.* at 120-121. Captain Hall had Appellant placed in a "treatment building, observation cell" so "he had no means to hurt himself." *Id.* at 121. Captain Hall summarized, "[Appellant] volunteered, in this case, that he murdered somebody. I didn't ask him who he murdered, how or anything, just he wanted to talk to the Pittsburgh police." *Id.* at 123. Captain Hall testified that his purpose in questioning Appellant was "not to find out if his claim was legitimate" but to determine "whether or not I ought to refer it to anybody or whether I ought to confine him under closer observation." *Id.* at 129.

Based on the above testimony, the trial court explained its reasoning for denying suppression as follows.

> After the [trial c]ourt heard [] testimony and the argument of counsel regarding the admissibility of [Appellant's] statements to Officer Young and Captain Hall, the [trial c]ourt stated, on the record, that it had found that the interaction between [Appellant] was not a custodial interrogation at all.
>
> This [trial c]ourt did not err in denying [Appellant's] request to suppress the statements he made to Officer Young and Captain Hall. The statements to Officer Young were clearly voluntary statements made by [Appellant] without any interrogation from Officer Young. [Appellant] called him to his cell and stated that he needed to see a [supervisor]. In asking him why he wanted to see a supervisor, Officer Young was not conducting an interrogation about a possible criminal offense, but

- 9 -

rather, was finding out why he needed to speak with a supervisor. When [Appellant] responded that he needed to speak to the supervisor because he had killed someone in Pittsburgh and wanted to talk to the Pittsburgh Police, that statement was also voluntary and not elicited from [Appellant] by Officer Young.

[Appellant's] interaction with Captain Hall also did not constitute a custodial interrogation. Captain Hall was not asking [Appellant] questions designed to elicit information concerning a crime, but, rather, was trying to find out why [Appellant] wanted to speak with a Pittsburgh Police Officer. In addition, as Captain Hall explained, [Appellant] had made statements indicating he may want to hurt himself and it was important for the Captain to evaluate the seriousness of these threats to determine whether [Appellant] needed to be placed in an area of the prison where he could be observed. Ultimately, based on [Appellant's] statements, he was moved to where he could be observed.

…

Here, [Appellant] was certainly aware that his statements would be shared with law enforcement. He was making the statements in an attempt to convince the corrections officers to allow him to speak with [the Pittsburgh Police]. Obviously, [Appellant] was aware that his statements would be relayed to law enforcement because that is exactly what he was asking Officer Young and Captain Hall to do.

…

In this case, [Officer Young and Captain Hall] were responding to [Appellant's] request that he be permitted to speak with Pittsburgh Police Officers regarding a crime that he claimed to have committed years earlier. Their questions to [Appellant] were limited in purpose; that purpose being to find out why [Appellant] wanted to talk to the Pittsburgh Police and also to assess his mental state.

- 10 -

Trial Court Opinion, 6/17/15, at 4-6, *citing* Trial Court Slip Opinion, 12/17/14.

The trial court's rationale is supported by the record and consonant with prevailing case law. Accordingly, we find that **Miranda** was not implicated in this case, and affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2016