J-S36012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TERRELL DIXON | |
| Appellant | No. 1825 MDA 2015 |

Appeal from the Judgment of Sentence September 17, 2015
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0000587-2014

BEFORE: MUNDY, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED MAY 05, 2016**

Appellant, Terrell Dixon, appeals from the September 17, 2015 judgment of sentence of three to six years' incarceration, imposed after the trial court convicted him of one count of carrying a firearm without a license.[1] After careful review, we affirm.

The suppression court summarized the factual history of this case as follows.

> On January 13, 2014, Manheim Borough Police Officers Kevin Oswald and Ryan Yarnell responded to a call of a trespass in progress at the Caribbean Inn at 1 South Charlotte Street, in the Borough of Manheim, Lancaster County. Officers Oswald and

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6106(a).

Yarnell arrived on scene within approximately five minutes of dispatch. As Officer Oswald approached the Caribbean Inn, he observed [Appellant], whom neither he nor Officer Yarnell recognized, and Jean-Luc Beers, an individual both officers knew, walking down the stairs to the street. Officer Oswald approached and engaged [Appellant] in conversation, while Officer Yarnell spoke to Mr. Beers.

Officer Oswald testified that [Appellant] and Mr. Beers appeared to be "in a rush to leave." He believed that both men were involved in the trespass call because they were leaving the Caribbean Inn not long after the call had been received. Officer Oswald testified that he did not ask for identification from [Appellant] nor did he direct [Appellant's] movements or accuse him of any crime. Officer Oswald asked if either man knew who had called the police, to which both men responded, "No." When asked, [Appellant] stated that he did not live at the Caribbean Inn. [Appellant] stated that he was present at the Caribbean Inn to see a friend, but did not know his friend's name and did not provide the friend's room number. As [Appellant] answered Officer Oswald's questions, he became nervous and spoke faster than normal. At some point, [Appellant] sat down on the steps outside the Caribbean Inn. Officer Oswald noticed that [Appellant] appeared very nervous, beyond a general anxiety of being around the police.

[Appellant] avoided eye contact as Officer Oswald talked to him, and he continued to touch his hooded sweatshirt in the area of his waistband. Officer Oswald described the behavior as "nervous behavior, where there was something in that area that he didn't want me to know about or it [sic] was subconsciously touching." Officer Oswald was then approached by a maintenance man of the Caribbean Inn who told Officer Oswald that "Brian had called the police … and that someone had a gun." Officer Oswald, recognizing that the waistband is a common area for weapons to be concealed, and believing that

[Appellant] had been nervously touching a firearm in his waistband, grabbed [Appellant's] right wrist and placed him up against a nearby wall.

Officer Yarnell did not hear the interaction between the maintenance man and Officer Oswald. Officer Yarnell testified that Mr. Beers looked over his shoulder at [Appellant] and said, "that's the guy you were called about." Before Officer Yarnell could inform Officer Oswald of this statement, Officer Yarnell saw that [Appellant] was already being held against a nearby wall by Officer Oswald.

Officer Oswald advised Officer Yarnell that a gun was involved, and he controlled [Appellant's] wrists until Officer Yarnell could respond. Even though Officer Oswald instructed [Appellant] not to move, [Appellant] offered some resistance as Officer Yarnell attempted to handcuff him. [Appellant] attempted to move his hands once he was handcuffed, and Officer Yarnell prevented any further movement. Both officers testified that [Appellant] was placed into handcuffs so that officers could determine if he was armed. Neither officer informed [Appellant] that he was under arrest before a pat-down was conducted.

Officer Yarnell conducted a pat-down of [Appellant's] clothes which revealed a .40 caliber glock pistol stowed in [Appellant's] waistband groin area. Officer Yarnell asked [Appellant] if he possessed a license to carry firearms, to which [Appellant] replied, "No, I'm not supposed to have that." Approximately three minutes elapsed from the time that Officers Oswald and Yarnell arrived on the scene until [Appellant] was placed into handcuffs.

Trial Court Opinion, 2/4/15, at 2-4 (citations to notes of testimony and footnotes omitted).

Appellant was charged with carrying a firearm without a license. On April 14, 2014, he filed a motion to suppress the evidence obtained from his encounter with Officers Oswald and Yarnell. The suppression court held a hearing on September 9, 2014, and issued its opinion and order denying the motion on February 4, 2015. Appellant proceeded to a non-jury trial on July 7, 2015, after which the trial court rendered its guilty verdict.[2] On September 17, 2015, the trial court sentenced Appellant to three to six years' incarceration. Appellant did not file a post-sentence motion. Appellant filed a timely notice of appeal on October 16, 2015.[3]

On appeal, Appellant presents a single issue for our review.

> Did the trial court err in denying [Appellant's] Motion to Suppress, where police had neither reasonable suspicion nor probable cause to justify the detention and/or arrest and frisk of [Appellant]?

Appellant's Brief at 4.

Our review of a trial court's suppression ruling is guided by the following.

---

[2] The Honorable Jeffery D. Wright presided at Appellant's trial, while the suppression motion was heard and decided by The Honorable James P. Cullen.

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925. Judge Wright issued a Memorandum of Opinion on November 13, 2015, in which he stated, "the reasons for the denial of [Appellant's suppression m]otion are stated in Judge Cullen's February [4], 2015 Opinion and Order. Therefore, I rely on that Opinion and Order to comply with Pa.R.A.P. 1925(a)."

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review. **Commonwealth v. Jones**, 605 Pa. 188, 988 A.2d 649, 654 (2010) (citations, quotations, and ellipses omitted). Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. **See In re L.J.**, 622 Pa. 126, 79 A.3d 1073, 1083–1087 (2013).

**Commonwealth v. Mathis**, 125 A.3d 780, 783 (Pa. Super. 2015), *appeal granted*, ---A.3d---, (Pa. 2016).

Instantly, Appellant contends "police had neither reasonable suspicion nor probable cause to justify the detention and/or arrest and frisk" of Appellant. Appellant's Brief at 11. Appellant asserts that "although the encounter with [Appellant] began as a 'mere encounter,' it ripened into an investigative detention without reasonable suspicion, then into a custodial arrest without probable cause, and the firearm seized during the frisk of [Appellant] should have been suppressed, along with [Appellant's] statements to police." *Id.* at 13. The essence of Appellant's argument is

that his interaction with police transformed from a mere encounter to a custodial detention without reasonable suspicion "when Officer Oswald informed [Appellant] that he was investigating a criminal trespass, instructed [Appellant] to sit on the steps and began asking questions." *Id.* at 18. Appellant avers that the investigative detention became an improper "custodial detention when [Appellant] was physically manipulated into handcuffs against the wall, and told not to move, without explanation." *Id.*

Conversely, the Commonwealth apprised the scenario presented on appeal as follows.

> [T]he interaction [the police officers] had with the Appellant started off as a mere encounter that went to an investigative detention supported by reasonable suspicion, and articulate[d] specific facts, that criminality was afoot. The period of detention was approximately 3 minutes, it did not involve any coercive tactics by police that would make the interactions the functional equivalent of an arrest. It wasn't until after the gun was found that the Appellant was arrested. It would be clearly unreasonable in this situation to prevent the Officer from making sure the person he was dealing with was not armed and dangerous.

Commonwealth's Brief at 11-12.

Upon review, we are not persuaded by Appellant's interpretation of events, and agree with the Commonwealth that suppression was not warranted. We recognize the applicable law as follows.

> [T]here are three levels of encounter that aid courts in conducting search and seizure analyses.

- 6 -

> The first of these is a "mere encounter"
> (or request for information) which need
> not be supported by any level of
> suspicion, but carries no official
> compulsion to stop or respond. The
> second, an "investigative detention"
> must be supported by reasonable
> suspicion; it subjects a suspect to a stop
> and period of detention, but does not
> involve such coercive conditions as to
> constitute the functional equivalent of
> arrest. Finally, an arrest or "custodial
> detention" must be supported by
> probable cause.

***Commonwealth v. Williams****,* 73 A.3d 609, 613
(Pa. Super. 2013) (citation omitted), *appeal denied,*
––– Pa. –––, 87 A.3d 320 (2014).

***

"The Fourth Amendment permits brief investigative
stops ... when a law enforcement officer has a
particularized and objective basis for suspecting the
particular person stopped of criminal activity."
***Navarette v. California****,* 134 S.Ct. 1683, 1687
(2014). It is axiomatic that to establish reasonable
suspicion, an officer "must be able to articulate
something more than an inchoate and
unparticularized suspicion or hunch." ***United States
v. Sokolow****,* 109 S.Ct. 1581 (1989) (internal
quotation marks and citation omitted). Unlike the
other amendments pertaining to criminal
proceedings, the Fourth Amendment is unique as it
has standards built into its text, *i.e.,* reasonableness
and probable cause. ***See generally*** U.S. Const.
amend. IV. However, as the Supreme Court has
long recognized, ***Terry v. Ohio****,* 88 S.Ct. 1868
(1968) is an exception to the textual standard of
probable cause. ***Florida v. Royer****,* 103 S.Ct. 1319
(1983). A suppression court is required to "take[ ]
into account the totality of the circumstances—the
whole picture." ***Navarette, supra*** (internal
quotation marks and citation omitted). When

conducting a **Terry** analysis, it is incumbent on the suppression court to inquire, based on all of the circumstances known to the officer *ex ante,* whether an objective basis for the seizure was present. **Adams v. Williams***,* 92 S.Ct. 1921 (1972). In addition, an officer may conduct a limited search, *i.e.,* a pat-down of the person stopped, if the officer possesses reasonable suspicion that the person stopped may be armed and dangerous. **United States v. Place***,* 103 S.Ct. 2637 (1983) (citation omitted).

**Commonwealth v. Carter**, 105 A.3d 765, 768-69 (Pa. Super. 2014) (parallel citations omitted), *appeal denied*, 117 A.3d 295 (Pa. 2015).

We have carefully scrutinized the transcript from the suppression hearing, at which two witnesses, Officer Kevin Oswald and Officer Ryan Yarnell, testified. Officer Oswald testified to responding to the Caribbean Inn boarding house, after receiving a call reporting a trespass from "another resident of the building." N.T., 9/9/14, at 5. Officer Oswald stated his "police department is at the Caribbean often. [One] South Charlotte is the boarding house and 3 South Charlotte is the attached bar. Because of the criminal activity that goes on in there, they have surveillance cameras so we did not want to park right where they know we were coming, depending on who was involved." **Id.** at 14. When Officer Oswald walked toward the Caribbean Inn, he saw Mr. Beers and Appellant exiting the building and walking toward the street. **Id.** at 7. Officer Oswald asked whether they knew who called the police, and testified that he, Officer Oswald, was "laid back. I wasn't – I initially wasn't sure if they were involved in the call. With that building, the way it is laid out inside – we respond there often – it

seems if something is going on, a lot of people would know about it because it is such close quarters. They are single rooms, several in a very tight area." *Id.* at 7-8. However, Officer Oswald subsequently observed that "both subjects appeared nervous. Neither one appeared like they wanted to speak with the police. They appeared to be in a rush to leave." *Id.* at 8. He said he did not direct Appellant's movements or accuse him of anything, and was "just asking general questions." *Id.* at 9. He also testified on direct examination as follows.

> [Appellant] appeared very nervous. When he was sitting on the steps he continued to touch [his] hooded sweatshirt in the area of his waistband. As I spoke with him, he answered a few of my general questions, started to speak faster, appeared more nervous. He was looking off into the distance. He didn't make a whole lot of eye contact during our interaction.
>
> …
>
> He appeared nervous. A lot of people we interact with are nervous to be around the police. This appeared to be more than that, you know, just the general anxiety of being around the police. It seemed like there was more he wasn't telling me.
>
> **Q.** While you were speaking with [Appellant,] did anyone else approach you?
>
> As I was speaking to [Appellant,] a maintenance worker for the Caribbean Inn approached me. He was speaking with another unknown male, but he stated to me that Brian had called the police – who was the original caller – and that someone had a gun.
>
> **Q.** As a result of that information, what did you do?

> At that time I grabbed [Appellant's] right arm and right hand, applied pressure, secured it, [and] advised Officer Yarnell there was a gun involved.
>
> **Q.** Why did you grab [Appellant]?
>
> The way he was behaving, how nervous he was, picking at his clothes, the fidgeting, touching the hoody. That information, and then the information that there was a gun, my initial reaction was he's the person with the gun. The gun is somewhere where he was just touching.
>
> **Q.** So why would you then apply to grab his hands?
>
> I chose to grab his right hand. Most people are right-handed. I did it for officer safety so I can secure that hand and that gun can't be drawn from wherever it's secured.
>
> **Q.** What happened next?
>
> Officer Yarnell approached. I assisted him in placing him in handcuffs – placing [Appellant], into handcuffs.

*Id.* at 9-11.

On cross-examination, Officer Oswald testified that when he encountered Appellant, he engaged Mr. Beers and Appellant with "Hey, guys, do you know who called the police? … I believe I explained the nature of the call, why we were there; someone called the police for trespassing. I explained to them that I just received the call. You guys are both walking out of here. I believed they were involved, just because of the timing." *Id.* at 19. Officer Oswald asked Appellant "why he was at the Caribbean. [He said he had] a friend that lives there. Didn't provide room number. Didn't

- 10 -

provide friend's name. Didn't know the friend's name. That was a follow-up question, well, who's your friend? Couldn't tell me a name." *Id.* at 33. Officer Oswald testified that his conversation with Appellant "took place on the steps. He eventually sat down on, I believe, the first or second step. Officer Yarnell spoke with [Mr. Beers] right in the area of the steps. We were probably within arms distance of each other, myself and Officer Yarnell." *Id.* at 20. Officer Oswald stated that he did not recall whether he asked Appellant to sit, but "it's possible." *Id.* He said "I don't recall. I do have people sit at times. I don't recall if I had him sit." *Id.* He explained that Appellant "wasn't [sitting for] an extended period of time" when a maintenance worker approached and "said that someone had a gun." *Id.* at 22-23. At that point, Officer Oswald grabbed Appellant and put him against a wall; Appellant "started pulling away with his hand a little bit," but partially complied as Officer Yarnell handcuffed Appellant and Officer Oswald patted him down. *Id.* at 24-25. Officer Oswald testified he "felt some resistance when I was holding [Appellant's] wrist and I explained to him, you know, don't pull away, stop moving." *Id.* at 27. He said that he "placed [Appellant] against the wall [not to arrest him, but] to secure him until I was able to determine if a gun was involved and if he was the one carrying that gun." *Id.* at 32. The officers also placed Mr. Beers in handcuffs, because they "still did not know who had the gun." *Id.* at 26. Officer Oswald testified he "absolutely" became concerned for his safety when Appellant

showed "fidgeting of the outer garments, the nervous behavior, evasive answers to my questions, and the biggest [reason] was the information that there was a gun involved…." *Id.* at 31-32.

Officer Yarnell corroborated Officer Oswald's testimony, noting that the officers reported to the Caribbean Inn at 9:43 p.m. on January 13, 2014, after receiving "a call for trespass" and information "that one of the tenants was needing help. There were possibly drugs involved, I believe it was indicated." *Id.* at 36-38. Officer Yarnell testified that like Officer Oswald, he knew Mr. Beers but did not know Appellant. *Id.* at 39. He stated that Mr. Beers was acting uncharacteristically nervous, and when he asked Mr. Beers "what's wrong" and "what are you worried about?" Mr. Beers "looked over his shoulder" toward Appellant and said "that's the guy you're looking for." *Id.* at 40-41. Officer Yarnell explained that he and Mr. Beers "didn't really get any further with the conversation" because he heard "Officer Oswald indicate to me that there is a gun," which prompted Officer Yarnell to "walk over [and] handcuff [Appellant]." *Id.* at 42.

Based on the above testimony, we conclude that the police officers initially had a mere encounter with Appellant when they arrived at the Caribbean Inn and Officer Oswald asked Appellant whether he knew who called the police. *Commonwealth v. Williams*, 73 A.3d 609, 615 (Pa. Super. 2013) (mere encounter where experienced officer, who knew the area to be one where crimes frequently occurred, observed appellant and

approached him to ask his name and destination; officer did not tell appellant he was not free to leave, and there was no indication that the officer in any way intimidated or threatened appellant, or suggested there would be any adverse consequence if he failed to identify himself), *appeal denied*, 87 A.3d 320 (Pa. 2014).

Although Officer Oswald testified that he could not recall whether Appellant proceeded to sit down on the steps at Officer Oswald's request, or of his own volition, Appellant's position on the steps, with the officers standing closely and in front of him, after Appellant initially attempted to walk away from the Caribbean Inn, indicates that Appellant did not feel free to leave or end the encounter, such that the mere encounter became an investigative detention. ***Commonwealth v. Gutierrez***, 36 A.3d 1104, 1107 (Pa. Super. 2012), *appeal denied*, 48 A.3d 1247 (Pa. 2012), *citing* ***Commonwealth v. Smith***, 732 A.2d 1226, 1232 (Pa. Super. 1999) (stating that whether a seizure has been effected hinges on "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter"), *affirmed*, 836 A.2d 5 (Pa. 2003). However, contrary to Appellant's assertions, the investigative detention was supported by the officers' objective reasonable suspicion that criminal activity was afoot, given the totality of the circumstances, where the officers were called to the Caribbean Inn, known for criminal activity, at approximately 9:45 p.m., and Appellant was both nervous and evasive in his interaction with

Officer Oswald. Further, the officers' search and handcuffing of Appellant upon learning about the existence of a gun did not constitute an illegal arrest, and was proper given the officers' concerns for their safety. ***Commonwealth v. Stevenson***, 894 A.2d 759, 772 (Pa. Super. 2006) (police officer may frisk an individual during an investigatory detention when the officer believes, based on specific and articulable facts, that the individual is armed and dangerous), *appeal denied*, 917 A.2d 846 (Pa. 2007); ***Commonwealth v. Rosas***, 875 A.2d 341, 348 (Pa. Super. 2005) ("for their safety, police officers may handcuff individuals during an investigative detention"), *appeal denied*, 897 A.2d 455 (Pa. 2006). Thus, Appellant was not under arrest until the officers discovered his firearm.

Based on the foregoing, we conclude that Appellant's suppression claim lacks merit. We therefore affirm the September 17, 2015 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/5/2016

- 14 -