Burton B. Roberts, J.
James Brown, who was on parole from a State prison sentence for the sale of narcotics, appeared at the Manhattan office of the New York State Department of Correctional Services on January 18, 1973 at about 5:00 p.m. and reported to his parole officer an incident that he claimed had occurred the previous night. He stated that he had been shot at, for reasons he either did not know or relate (the record is silent), by an assailant whom he named and who, he stated, had quickly fled the scene. Brown’s parole officer directed him to see Parole Officer Richard Beyrer and his associates in the Division of Parole’s Bureau of Special Services, whose responsibility was to investigate instances of suspected misconduct by parolees.
Beyrer asked Brown if he had reported the shooting to the police. He replied that he had not, because he feared his attacker. Brown’s person was searched. He had approximately $1,000 in cash in his possession. The money, he explained was the result of his employment as a bill collector, collecting debts owed by bars and other establishments to a record company in Harlem. Brown was then asked to account for his activities following the incident. He stated that he had gone to a hotel for the night, afraid to return to his own residence. The next morning he went to work, and from there to see his parole officer.
In describing how he had arrived at the parole office, Brown gave different versions. First he said he had taken a taxi. Later, he claimed that he had been driven in a private car and let off a few blocks away. Glancing out to the street, however, the officers could not help but notice a “ conspicuous-looking ” 1973 Cadillac, waiting directly in front of the building entrance, with someone seated in it. While Brown was being questioned, they were able to quickly ascertain, from other sources, that the Cadillac was customarily used by Brown and was registered to his wife at their home address. Confronted with this information, . Brown finally offered the story that he had taken a cab to the vicinity of the office, walked the rest of the way, and that *702 he had arranged to be picked up in his car at the parole office by somebody from his employer’s firm.
With this, Officer Beyrer told Brown that he and his associates intended to search the car, and asked him to identify the occupant. Brown responded, ££I don’t know who’s down there, but if that fellow has any guns on him, I don’t know anything about it.”
The officers went downstairs to the street and approached the car. Alone inside of it, seated in the front passenger seat, was the defendant, Elmore Thompson. Officer Beyrer approached him and asked him if he was with Brown. ££ Ho, not really ’ ’, was the reply. The officer also asked him if he had any identification. The reply was negative. He then asked the defendant for his name. The reply was silence.
Beyrer told defendant of their intention to search the car, and asked him to step out. Thompson complied and as he left the front seat, he reached down and picked up an attache case which had been lying flat on the floor of the car between his feet. At about this moment, one of the other officers drew his gun. Beyrer, fearful that the defendant was armed, took the case away from him and put it on the roof of the car. Then he spun Thompson around, so that they were both facing the vehicle, and patted down the outside of his clothing. He felt two objects bulging at the defendant’s waist and reached for them. From Thompson’s ibelt he removed a .38 caliber revolver and a .357 magnum pistol, both fully loaded. He then opened the snaps of the attache case and looked inside. It contained a .30 caliber carbine filled with 27 live rounds of ammunition and, lying beside it, a white metal silencer.
Defendant stands indicted for possession of these weapons, which are now the subject of this pretrial suppression motion. The above recitation constitutes the court’s findings of fact after a hearing on the motion at which Parole Officer Beyrer testified, uncontradicted, on behalf of the prosecution.
Hot surpisingly, the People do not contend that there was probable cause to search the Cadillac, the defendant’s person or the attache case. -Clearly, that standard was not met by the facts which were available to the parole officers in the instant situation. (See People v. Moore, 32 N Y 2d 67, 73 [Wachtler, J., dissenting].) The District Attorney does, however, offer another theory on which to sustain the admissibility of the items seized. It is claimed that the parole officers had the right to search the Cadillac and its contents, including the attache case, pursuant to their supervisory powers over Brown as a parolee. (See *703 People v. Santos, 31 A D 2d 508 [1st Dept., 1969], affd. without opn. 25 N Y 2d 976, cert. den. 397 U. S. 969.) In carrying out this authority, it is argued, the officers reasonably suspected that the defendant was armed and, therefore, their limited “ frisk” of bim for weapons was constitutionally permissible. (See Terry v. Ohio, 392 U. S. 1.)
In rebuttal, the defense makes two salient observations: first, that the defendant was not a parolee and the attache case, which was between his legs, by all observable indicia belonged to him; second, that New York’s “ stop and frisk ” statute (CPL 140.50) applies only to “police officers” while parole officers, who hold “peace officer ” status (CPL 1.20, subd. 33, par. [i]) are not defined as “ police officers ” {id., subd. 34).
The motion to suppress is denied.
Although the parole officers here lacked probable cause to search the Cadillac, probable cause was not a necessary prerequisite to a search of the ear by these officers. The standard to be applied is one of “reasonableness”. “ [A parolee] is subject to a search that would be impermissible in the ordinary situation (People v. Randazzo, 15 N Y 2d 526). The distinction is that the protection afforded by the Fourth Amendment is only against unreasonable searches, and what is reasonable in the case of a parolee is not the same as what is reasonable in the case of another (United States v. Follette, 288 F. Supp. 10). The very concept of- parole entails a degree of supervision of parolees consonant with its purposes. Included within that supervision would be such searches as would reasonably be called for.” (People v. Santos, 31 A D 2d 508, 509, supra; see United States ex rel. Santos v. New York State Bd. of Parole, 441 F. 2d 1216 [2d Cir., 1972]; also, see, People v. Hingerton, 74 Misc 2d 1063; People v. Way, 65 Misc 2d 865.) The parole officers here wore properly investigating Brown, a parolee who was a convicted narcotics trafficker and whose current activities — as evidenced by the assassination attempt a large amount of cash and .an overabundance of evasiveness — appeared equally nefarious. They were confronted with the Cadillac, obviously Brown’s, the significance of which grew more suspect with his every attempt to conceal its presence, and the illicit nature of which he all but admitted, albeit in a desperate kind of self-exculpatory way, after the officers’ determination to search it was announced. There were, therefore, reasonable grounds for an investigation as to whether Brown was violating his parole and a search of the Cadillac was a reasonable and proper incident of that investigation. (Cf. People v. Langella, 41 Misc 2d 65.)
*704 Indeed, counsel for the defendant does not press any contention to the contrary. The thrust of his argument is that any right the parole officers had to search the car did not justify searching the person of the defendant, who was not a parolee, or the attache case, which had every indication of being the defendant’s property.
Once we recognize the authority of parole officers to search parolees and their premises, however, we cannot ignore the hazards involved in this kind of public duty. (See People v. Rivera, 14 N Y 2d 441, 446.) A bullet’s message is deadly no matter who the sender is. A law-enforcement officer in a potentially perilous .situation must have a basic right of self-protection notwithstanding the shape of his badge. As long as an officer is properly pursuing his lawful duty, the only issue ‘ ‘ is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety * * * was in danger.” (Terry v. Ohio, 392 U. S. 1, 27, supra.) The parole officers in the instant case had ample reason to fear that the defendant was armed with a gun, or even, as Brown ¡had intimated, with “ guns ”. The parolee had practically told them so, in a context so characteristic of human behavior as to be sufficiently reliable to place that fear in any reasonable man. The officers were thus justified in taking reasonable steps to assure themselves that a deadly weapon could not be suddenly used against them while they proceeded to search the car. (Id., p. 23.)[1]
Put another way, the parolee officers’ decision to search the Cadillac, their belief that the defendant, an occupant of the car, was armed and that their own safety was in danger, and their limited 1 ‘ frisk ’ ’ of the defendant were all reasonable. And “ if * # * conduct is reasonable it does not offend consti *705 tutional limitations and the evidence obtained as a result of such conduct is admissible. ’ ’ (People v. Arthurs, 24 N Y 2d 688, 691.)
I conclude, therefore, that the guns taken from the defendant’s belt were constitutionally seized. This being the case, it need not be decided whether the search of the attache case was a proper incident of the parole investigation (although it might well be argued that the right of the parole officers to search the car extended to all its various contents notwithstanding mere appearances as to the ownership thereof, and the admissibility of the carbine and silencer might be separately sustainable on such basis). Given the propriety of the seizure of the pistols, the contents of the attache case are admissible as the result of a search incident to a lawful arrest. (Chimel v. California, 395 U. S. 752.)
The fact that parole officers are not police officers authorized under the u stop-and-frisk” law (CPL 140.50) is not decisive here unless it is to be held that the existence of this statute absolutely precludes all law-enforcement officers other than those technically denominated as “ police officers ” from conducting a limited search for weapons when, in the course of1 performing their lawful duties, they reasonably fear for their own safety. If no such preclusion was intended by this statute — for surely none is stated- — • then the question, as indicated above, is merely whether the search was reasonable under the Fourth Amendment. “ Just as a search authorized by state law may be an unreasonable one under [the Fourth Amendment] so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.” (Cooper v. California, 386 U. S. 58, 61; see Sibron v. New York, 392 U. S. 40, 61.)
It is clear that such preclusion was not intended by CPL 140.50 (which is set forth in the footnote).[2]
*706 The original version of the statute (Code Crim. Pro., § 180-a), which was virtually the same as subdivisions 1 and 3 of the present law (with the exception of the reference to court officers in subdivision 3), dealt specifically with the authority of the police to stop and question persons acting suspiciously in public places and applied only to the search of those stopped under such circumstances. The legislative history of1 *the original provision (L. 1964, .ch. -86, § 2) indicates that it was passed in order to reconcile conflicting case law dealing with that particular fact pattern and codify it in favor of the police power (Governor’s Annual Message, N. Y. Legis. Annual, 1964, 466, 470; Memorandum of .Combined Council of Law Enforcement Officials, id. 62; Governor’s Memorandum on Bill Approved, id. 502.) Its passage did not create the authority, which is said to have had its origins at common law (People v. Rivera, 14 N Y 2d 441, 445, supra and cases cited therein at p. 446), nor can it possibly be said to have been intended to circumscribe the boundaries of perfectly reasonable actions by law-enforcement officers which are not incident to the stopping and questioning of individuals exhibiting suspicious behavior while about in public.[3] What the statute does limit to those enumerated is *707 the threshold authority to stop and question, on less than probable cause, people generally abroad. That authority is restricted to police officers, as it should be, by virtue of the scope of their assigned duties and the breadth of their training and experience in observing and interpreting “ street ” situations. (See Terry v. Ohio, 392 U. S. 1, 33, supra.) But the vital ability to conduct a search for weapons upon the reasonable belief that one’s life or limb may be in danger need not, cannot and was not meant to be so arbitrarily limited. It concerns an interest entirely separable ” from the question of whether an officer is empowered to stop and question suspicious pedestrians. (People v. Rivera, 14 N Y 2d 441, 443, supra.) “ An arrest is a wholly different land of intrusion * * * from a limited search for weapons, and the interests each is designed to serve are likewise quite different. * * * Moreover, a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into cusody for the purpose of prosecuting him for a crime.” (Terry v. Ohio, 392 U. S. 1, 26-27, supra.) Surely the Supreme Court was not referring to police officers in the technical New York CPL sense when it stated: “We are now concerned with moré than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted .with guns and knives.” (Footnote omitted.) (id., pp. 23-24.)
In the last analysis, then, the right of self-preservation need hardly depend upon statutory sanction. It is rather, as Hobbes put it, “ The sum of the right of .Nature ” (Leviathan, part 1, ch. 14). As long as that natural right is exercised upon reasonable grounds and the means used to effectuate it are correspondingly narrow in scope, evidence obtained therebv is constitutionally admissible. (People v. Taggart, 20 N Y 2d 335.)

. I have not considered the significance, if any, of the defendant’s responses to the officers’ questions which occurred prior to the search herein. Thus, it need not be decided whether the parole officers had the authority to question the defendant based upon suspicion engendered by Brown’s statements. (Cf. CPL 140.50, subd. 1.) In my view, the right of any law-enforcement officer who is properly pursuing his lawful duty to conduct a limited search for weapons when there are reasonable grounds to believe that his safety is in danger exists separate and apart from any power that the officer may or may not have to stop and/or question an individual. (See Terry v. Ohio, 392 U. S. 1, 26, supra; People v. Rivera, 14 N Y 2d 441, 443 supra.) This is one reason I feel the limitation of CPL 140.50 to “police officers”, to be'irrelevant here. (See infra.) My decision in this case, therefore, is based solely on the narrow grounds of self-protection, and my finding of the reasonableness of the parole officers’ belief that defendant was armed is based on factors exclusive of the defendant’s responses to the questions asked by the officers.

. “ § 140.50 Temporary questioning of persons in public places; search for weapons.
“ 1. In addition to the authority provided by this article for making an arrest without a warrant, a police officer may stop a person in a public place located within the geographical area of such officer’s employment when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct.
“2. A court officer of the criminal courts of this state or a court officer of any court of the unified court system within the city of New York may stop a person in or about the courtroom to which he is assigned when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct.
*706 “3. When upon stopping a person under circumstances prescribed in subdivisions one and two a police officer or court officer, as the case may be, reasonably suspects that he is in danger of physical injury, he may search such person for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. If he finds such a weapon or instrument, or any other property possession of which he reasonably believes may constitute the commission of a crime, he may take it and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.”

. In 1972 and 1973 the statute was amended (L. 1972, eh. 911, § 1; L. 1973, ch. 159, § 1; L. 1973, ch. 714, § 1), purportedly to extend its authority to various court officers who, like parole officers, are also “peace officers” (CPL 1.20, subd. 33, pars, [b]., [e], [d], [e]) but not “police officers” (id., subd. 34). While it may be, perhaps, arguable that this amendment evinces a legislative objective to specifically enumerate those entitled to search for weapons based upon “reasonable suspicion”, such a contention is tenuous at best. The more logical view would still seem to be that it is the authority to stop and question persons acting suspiciously in and about public courtrooms that is limited to court officers, for subdivision 3 still pertains to those stopped pursuant to subdivision 2. This view is apparently supported by the official commentary: “ It is questionable whether this legislation is necessary to imbue court officers with the indicated authority [to frisk suspicious trial spectators or visitors]. It would seem that such power falls easily within their functions and, at the very least, can readily be bestowed by rules and regulations of the appropriate courts and agencies. By analogy, it is certainly unnecessary to amend this section in similar fashion in order to empower state prison per *707 sonnel to search or frisk visitors to their institutions. [But] the amendment certifies the court officers’ authority in this regard and, in any event, can do no harm.” (R. Denzer, 1972 Supplementary Practice Commentary, in McKinney’s Cons. Laws of N. Y., 1973-74 Supp., p. 69.)