IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 35 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 2099 MDA 2014 dated |
| | : | 9/22/15, reconsideration denied |
| v. | : | 11/23/15, affirming the judgment of |
| | : | sentence of Dauphin County Court of |
| | : | Common Pleas, Criminal Division, at |
| | : | No. CP-22-CR-0000174-2014 dated |
| DARRIN ORLANDO MATHIS, | : | 11/25/14 |
| | : | |
| Appellant | : | ARGUED: November 2, 2016 |

**OPINION**

**CHIEF JUSTICE SAYLOR**                    **DECIDED: November 22, 2017**

This discretionary appeal pertains to the authority of parole agents to detain and frisk a non-parolee visitor while performing a routine check at a parolee's home. We also granted review to address whether reasonable suspicion existed to justify the seizure and frisk in this instance.

By way of background, state parole agents' authority and duties with respect to parolees are prescribed by two sections of the Prisons and Parole Code.[1] Section 6152 declares agents to be peace officers and provides them with police power to arrest

---

[1] Act of Aug. 11, 2009, P.L. 147, No. 33, §7 (as amended 61 Pa.C.S. §§6151-53) (the "Parole Code"). As used in the statute, "offender" denotes "[a]ny person subject to the parole or probationary supervision of the board." 61 Pa.C.S. §6151.

without warrant any parolee under supervision for violating parole conditions. *See* 61 Pa.C.S. §6152. Section 6153 deems parole agents to be in a "supervisory relationship with their offenders," aimed at assisting parolees in rehabilitation and reassimilation and protecting the public. *Id.* §6153(a). This section further outlines the procedures and requirements for agents to search the person and property of offenders, *see id.* §6153(b)(1), (d), and provides that such searches must comport with the protections of the United States and Pennsylvania Constitutions, *see id.* §6153(b)(2). Another provision prevents the exclusion of evidence from parole or criminal proceedings based solely on a violation of the statute. *See id.* §6153(c).

Turning to the facts, on December 2, 2013, Pennsylvania Parole Agents Michael Welsh and Gregory Bruner conducted a routine home visit to the residence of parolee Gary Waters.[2] Agent Welsh characterized the neighborhood as a "high crime" area. N.T., July 28, 2015, at 4. Waters invited the agents into the home, where they immediately recognized the strong odor of marijuana, which increased as they continued through the home. The agents and Waters proceeded through the front room and dining room to the kitchen, where Appellant Darrin Orlando Mathis was seated in a

---

[2] These facts derive from Appellant's and Agent Welsh's testimony at a hearing on Appellant's motion to suppress evidence. Ordinarily, when a defendant challenges an adverse ruling of a suppression court, as is the case here, a reviewing court is bound by the suppression court's factual findings that are supported by the record, considering only the evidence of the prosecution and so much of the defense's evidence that remains uncontradicted. *See Commonwealth v. D'Amato*, 514 Pa. 471, 482, 526 A.2d 300, 305 (1987) (citation omitted). In this instance, however, the suppression court did not enter findings of facts, nor did it file a Rule 1925(a) opinion upon appeal to the Superior Court, due to a health emergency. *See Commonwealth v. Mathis*, 125 A.3d 780, 783 n.5 (Pa. Super. 2015). Nevertheless, as the Commonwealth was the prevailing party before the suppression court, we view the evidence in its favor. *See Commonwealth v. Logan*, 468 Pa. 424, 429-30, 364 A.2d 266, 269 (1976). Furthermore, Agent Welsh's and Appellant's depictions of the events substantially align, with only minor discrepancies that will be resolved by reference to the above precepts.

chair, near the rear door of the home, in the midst of receiving a hair cut from Waters. Waters, who was a barber by trade, identified the parole agents to Appellant. Agent Welsh then detained Waters in the front room, questioning him regarding the marijuana odor. Agent Welsh also noticed at this time an ashtray full of marijuana "roaches" sitting on a table in the front room. N.T., July 28, 2014, at 9. However, neither agent witnessed anyone actually smoking, nor was there any particular indication that marijuana had been smoked in the kitchen.

While Agent Welsh dealt with Waters, Agent Bruner maintained visual contact with Appellant. Appellant repeatedly got up from the chair and walked to the kitchen counter, apparently checking text messages on his charging cellphone. Agent Bruner alerted Agent Welsh that Appellant "seemed pretty nervous." N.T., July 28, 2014, at 9. Agent Welsh returned to the kitchen briefly, stating to Appellant, "I prefer you not being on the cell phone for safety reasons. Could you please put that away." *Id.* at 10.

Thereafter, according to Appellant, Agent Welsh asked him to leave, explaining that "[w]e want to finish talking to parolee. You can come back and get your haircut finished wherever [sic] you want to. . . . I don't want to put you through [an] unnecessar[y] search[] and all that." *Id.* at 54 (alterations added). Appellant recalled that "[i]t sounded like [Agent Welsh] wanted me to hurry up and leave," and that he felt he was being "hurried along." *Id.* at 54-55.

Agent Welsh's recollection differed minimally, as he recalled stating to Appellant that "I want to get you out of here as soon as I possibly can. Could you do me a favor, grab your personal belongings and come to the front room." *Id.* at 10. Both Agent Welsh and Appellant agreed that Appellant was cooperative with all of the agent's requests. Further, Agent Welsh testified that the encounter, to that point, remained relaxed and conversational, but that Appellant "appeared uneasy[, displaying b]roken

eye contact [and] speaking nervously, broken up." *Id.* at 28 (alterations added); *see also id.* at 26 (characterizing their interactions as "very light . . . [w]e were talking . . . other than his nervous behavior, . . . he was being cooperative"). The agent explained that he intended to identify Appellant and whether he had any outstanding warrants, so as to confirm with whom Waters was associating. *See id.* at 10, 23.

As Appellant collected his belongings in the kitchen, Agent Welsh noticed that he picked up his jacket by "real gently plac[ing] a hand underneath the jacket and over top of the jacket and kind of h[olding] it up to his body like it was a football [or] a baby." *Id.* at 10-11. When Appellant began walking to the other room, he continued to hold the jacket to his side in a "protecting type of grip" while also turning away from the agent, which revealed a bulge in the jacket. *Id.* at 10-11. These observations caused Agent Welsh to have concerns regarding the agents' safety. He then asked Appellant if he could pat him down for safety reasons, because he "intended [Appellant] not to leave the residence with [a] gun or drugs." *Id.* at 31. Appellant refused, at which time Agent Welsh again noticed the bulge, described as the size of a cigarette pack or wallet, which further raised Agent Welsh's suspicions that Appellant may be secreting contraband or a weapon. Agent Welsh reached out to the bulge and felt what he believed was the handle of a firearm. He seized the jacket and pulled it forcefully from Appellant, throwing it to the ground. Appellant was then handcuffed and patted down. Thereafter, Agent Welsh noticed a bag of marijuana on the floor between Appellant's feet, while Agent Bruner recovered a handgun from the jacket.

A local police officer reported to the residence, and Appellant admitted to ownership of the weapon and drugs. A criminal history check revealed that Appellant was prohibited from possessing a firearm. The officer arrested Appellant and charged

him with possessory offenses of a prohibited firearm, a small amount of marijuana, and drug paraphernalia.[3]

Appellant filed a pretrial motion to suppress the physical evidence and his statement to police, asserting that parole agents have no statutory authority over non-offenders and that Agent Welsh did not have reasonable suspicion to detain and frisk him. At the hearing, Appellant, Agent Welsh, and the arresting officer testified, developing the above-recited facts. The trial court denied Appellant's motion to suppress. *See supra* note 2. Following a stipulated bench trial, Appellant was convicted of all charges and sentenced to thirty-two to sixty-four months' imprisonment. He appealed to the Superior Court.

In a published opinion, a three-judge panel of the Superior Court rejected Appellant's claims that the parole agents lacked authority to perform a protective frisk of a non-parolee visitor and that the agents lacked reasonable suspicion to believe Appellant was armed and dangerous. *See Commonwealth v. Mathis*, 125 A.3d 780, 791-92 (Pa. Super. 2015). Initially, the intermediate court acknowledged that, since Sections 6152 and 6153 of the Parole Code only address agents' authority with respect to offenders, parole agents are generally not empowered to act as police officers relative to non-offenders. In this respect, the court found pertinent the decision in *Commonwealth v. Scott*, 916 A.2d 695 (Pa. Super.), *appeal denied*, 937 A.2d 445 (Pa. 2007) (table).

In *Scott*, two probation officers conducted a routine home check of a probationer. While they were there, the probationer's nephew attempted to leave with a black bag that belonged to him. The probation officers ultimately opened the bag without the nephew's consent, discovering marijuana and scales.

---

[3] *See* 18 Pa.C.S. §6105(a)(1); 35 P.S. §§780-113(a)(31), (32).

The Superior Court affirmed the suppression of the evidence, holding that the probation officers possessed police power and authority only with respect to the probationer, and thus, "[t]hey had no right to interact with [the nephew] in any official capacity." *Id.* at 697-98. The intermediate court continued that, even if there was authority to conduct a *Terry* stop,[4] the probation officers had no reasonable basis for detaining the nephew. *See id.* at 698.

However, the appellate panel explained that the present facts were substantively different and posited that the *Scott* decision "left unsettled the situation where, as here, a parole officer, while performing his official duties in an offender's home, encounters a person, other than the parolee, whom the parole agent reasonably believes might be armed and dangerous." *Mathis*, 125 A.3d at 787.

Concluding that other Pennsylvania case law provided little guidance, the appellate panel found instructive *State v. Barnes*, No. 15149, 1996 WL 501464 (Ohio Ct. App. Sept. 6, 1996) (unpublished), in assessing the "ancillary authority" of parole agents. *Id.* at *3. In that case, the Ohio Court of Appeals explained that agents, "in the context of their limited statutory authority to arrest parole violators, . . . possess the concomitant authority to conduct a weapons frisk of a non-parolee" when circumstances warrant. *Id.* at *4. The Ohio court reasoned that "it would be anomalous to hold that parole officers may carry weapons like peace officers, place themselves in peril like peace officers, and conduct lawful arrests like peace officers, yet not protect themselves in the face of apparent danger." *Id.*

The Superior Court also cited *People v. Rios*, 122 Cal. Rptr. 3d 96 (Cal. Ct. App. 2011), in which juvenile probation officers were found to have authority to detain and pat-down a visitor in the juvenile offender's home. The *Rios* court developed that, once

---

[4] *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

the officers were lawfully on the premises, it was reasonable for them to determine whether the juvenile probationer's association with others present violated the terms of supervision. In this regard, and following a rationale similar to that employed by the *Barnes* court, the California Court of Appeals advanced that the agents' statutory authority as peace officers included the right to detain and frisk, so long as it comported with *Terry* principles. *See id.* at 110. The court continued that it would be unreasonable "[t]o hold . . . that juvenile probation officers could not detain or investigate anyone on the same premises as the juvenile probationer, no matter the circumstances or officer safety issues, unless they were accompanied by police or other law enforcement officers." *Id.* The Superior Court also noted that a Louisiana appellate decision reflected analogous reasoning. *See State v. Jones*, 78 So. 3d 274, 282 (La. Ct. App. 2011) ("Louisiana law recognizes that law enforcement officers should not be required to take unnecessary risks [in] performing their duties.").[5]

Deeming these cases persuasive, particularly *Barnes*, the Superior Court additionally observed that courts have sanctioned a *Terry* frisk of non-resident visitors to insure officer safety during the execution of search warrants, *see Mathis*, 125 A.3d at 789 (citing *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338 (1979); *Commonwealth v. Eichelberger*, 352 Pa. Super. 507, 508 A.2d 589 (1986); *Commonwealth v. Luddy*, 281 Pa. Super. 541, 422 A.2d 601 (1980)), as well as the brief detention and movement of an arrestee's companion, regardless of any suspicion of dangerousness, *see id.* (citing *Commonwealth v. Graham*, 685 A.2d 132 (Pa. Super. 1996), *rev'd on other grounds*,

---

[5] Although not discussed by the Superior Court, pursuant to Louisiana law, "[p]robation officers [are] deemed to be peace officers and shall have the same powers with respect to criminal matters and the enforcement of the law relating thereto as sheriffs, constables, and police officers have in their respective jurisdictions." LA. CODE CRIM. PROC. ANN. art. 899; *see also* LA. STAT. ANN. §15:574.8 (applying an identical provision to parole officers).

554 Pa. 472, 721 A.2d 1075 (Pa. 1998); *In re N.L.*, 739 A.2d 564 (Pa. Super. 1999)).

In light of the above, the Superior Court concluded as follows:

> Within the context of their limited statutory authority over parolees, we must recognize a parole officer's concomitant authority to conduct a weapons frisk of a non-parolee when the facts and circumstances would warrant a reasonably prudent police officer in doing the same. Parole agents face the same extreme safety risks as police officers, and routinely encounter persons other than the parolee, who are present during an arrest and/or search of an approved residence. It is irrational to presume that a parole agent will only ever encounter his parolee during an arrest or home visit. We believe that while a parole agent is performing his official statutory duties, he is entitled to the same protections this Commonwealth has afforded to police officers with respect to his interaction with third parties, other than the parolee. Accordingly, we conclude that a parole agent's statutory authority to detain and arrest parolees includes the ancillary authority to conduct a weapons frisk of any person present, during an arrest or home visit, where the parole agent has a reasonable suspicion that a person searched may be armed and dangerous.

*Id.* at 789-90.

As pertains to reasonable suspicion supporting the protective frisk, the intermediate court rejected Appellant's claim that Agent Welsh's observation of the bulge alone was insufficient to justify the belief that he was secreting a weapon or contraband. The Superior Court noted that the parole agent had developed suspicions predicated on Appellant's nervous behavior and furtive handling of his coat. Moreover, the appellate court explained that the agent "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Mathis*, 125 A.3d at 791 (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883) (alteration in original). Thus, in the appellate court's view, the circumstances warranted a *Terry* search to secure the agents' safety. Accordingly, the court affirmed Appellant's judgment of sentence.

Appellant sought this Court's discretionary review, which we granted, to address the following:

> Whether, as a matter of first impression, the Superior Court erred in affirming the trial court's decision denying [Appellant's] motion to suppress evidence where state parole agents lacked authority and subsequently reasonable suspicion to detain [Appellant] and conduct an investigative detention in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution?

*Commonwealth v. Mathis*, 635 Pa. 210, 134 A.3d 51 (2016) (*per curiam*) (alterations added). We instructed the parties to "separately address in their briefs the subsumed and alternate claims respecting (1) the authority of parole agents, and (2) whether reasonable suspicion existed to support a seizure and a subsequent weapons frisk." *Id.* The issue of parole agents' authority presents a purely legal question, over which our standard of review is *de novo* and our scope of review plenary. *See Commonwealth v. Eisenberg*, 626 Pa. 512, 532, 98 A.3d 1268, 1279 (2014). As to whether reasonable suspicion existed, we defer to the suppression court's findings of fact as supported by the suppression hearing record, which we assess in the light most favorable to the Commonwealth as the prevailing party. *See D'Amato*, 514 Pa. at 482, 526 A.2d at 305; *Logan*, 468 Pa. at 429-30, 364 A.2d at 269.[6] However, we review any legal conclusions *de novo*. *See In re L.J.*, 622 Pa. 126, 138 n.6, 146, 79 A.3d 1073, 1080 n.6, 1085 (2013).

Beginning with the issue of the agents' authority, Appellant maintains that Sections 6152 and 6153 limit parole agents' police power to offenders. He argues that the lack of express reference to non-parolees or guests of offenders in granting search powers renders any such conduct illegal. Appellant observes that parole agents may

---

[6] As noted, the suppression court's lack of factual findings does not impede review of this matter. *See supra* note 2.

not act as "stalking horses" for the police, *Commonwealth v. Pickron*, 535 Pa. 241, 248, 634 A.2d 1093, 1097 (1993), and that the Fourth Amendment has been interpreted as requiring a statutory framework to direct warrantless searches of a parolee's residence in order to protect privacy interests. *See id.* at 249-50, 634 A.2d at 1098. Appellant posits that Sections 6152 and 6153 fulfill this role and, based on a plain reading, limit authority to persons subject to supervision.

Citing a number of Pennsylvania Supreme Court decisions that found various authorities improperly engaged in criminal law enforcement activities, Appellant develops that the Court has consistently employed a strict construction in interpreting the relevant authorizing statutes and has required evidentiary suppression for any breaches. *See, e.g.*, *Commonwealth v. Price*, 543 Pa. 403, 672 A.2d 280 (1996) (holding that FBI agents lack authority to stop and arrest a motorist for vehicle code violations); *McKinley v. PennDOT, Bureau of Driver Licensing*, 576 Pa. 85, 838 A.2d 700 (2003) (refusing to permit airport police's extra-jurisdictional enforcement of the Implied Consent Law); *Kopko v. Miller*, 586 Pa. 170, 892 A.2d 766 (2006) (explaining that sheriffs do not have criminal investigative and arrest authority relative to the Wiretapping and Electronic Surveillance Control Act); *Commonwealth v. Dobbins*, 594 Pa. 71, 934 A.2d 1170 (2007) (rejecting the sheriff's claim of authority to conduct independent investigations pursuant to The Controlled Substance, Drug, Device and Cosmetic Act); *Commonwealth v. Marconi*, 619 Pa. 401, 64 A.3d 1036 (2013) (holding that sheriffs lack authority to independently establish and conduct suspicionless roadside sobriety checkpoints); *see also Kopko*, 586 Pa. at 193, 892 A.2d at 779 ("It is well settled that when vesting a group with police powers and duties, the Legislature does so with specificity." (quoting *Commonwealth v. Dietterick*, 429 Pa. Super. 180, 185-86, 631 A.2d 1347, 1350 (1993)) (alterations omitted)).

Additionally, Appellant views the *Scott* decision as factually indistinguishable from the present circumstances and demonstrative of the limitation on parole agents' power. He further reasons that the search of a private citizen, even under the guise of enforcing parole conditions, nonetheless results in the abridgement of a private citizen's rights predicated solely on an association with a parolee. Accordingly, Appellant contends that the evidence should have been suppressed.[7]

The Commonwealth initially responds by generally agreeing that Section 6153 delineates parole agents' authority to search offenders. As to Section 6152, deeming agents as "peace officers," the Commonwealth posits that the police power to effectuate arrests of parolees comes with the same dangers and threats that police officers experience, and therefore, agents have the authority to frisk individuals for weapons to ensure their safety.

Conceding that no explicit statutory authority grants agents the power to conduct a *Terry* frisk of a non-offender, the Commonwealth nonetheless contends that a protective frisk may be employed while parole agents are performing their statutory duties. In this respect, the Commonwealth highlights Section 6153(b)(2), which provides that "nothing in this section shall be construed to permit searches or seizures in violation of the Constitution of the United States or Section 8 of Article I of the Constitution of Pennsylvania." 61 Pa.C.S. §6153(b)(2). From this the Commonwealth reasons that, since *Terry* frisks are not statutorily prohibited, they are presumptively permitted, so long as they do not violate constitutional norms. Along this same line, the

---

[7] The Pennsylvania Association of Criminal Defense Lawyers filed an *amicus curiae* brief supporting Appellant, in which it generally reiterates Appellant's arguments that there is no statutory authority for agents to conduct protective frisks of non-parolees, that the decisional law of this Court requires suppression when authorities exceed their statutory authorization, and that reasonable suspicion did not support the detention and frisk.

Commonwealth observes that Section 6153 prescribes that "no violation of this section shall constitute an independent ground for suppression of evidence in any . . . criminal proceeding." *Id.* §6153(c). Thus, from the Commonwealth's perspective, these provisions leave open the ancillary authority to perform protective searches.

Regarding Appellant's reliance on *Scott*, the Commonwealth disputes that the case is indistinguishable from the present matter, emphasizing the differing circumstances in that matter, including that there was no parole violation, the parolee was not being detained, and there was no indication that the non-offender posed a risk to the agents. *See Scott*, 916 A.2d at 698 ("No evidence was presented to suggest the officers believed [the non-parolee] to be armed and dangerous, warranting a search for their protection."). In the Commonwealth's view, the *Scott* court anticipated agents' authority to search under a factual scenario such as the one here.

Additionally, the Commonwealth refutes the notion that permitting *Terry* searches would extend an agent's authority to investigate crimes that are plainly outside of their statutory grant. The Commonwealth distinguishes the cases that Appellant cites in this regard, observing that the FBI agents and sheriffs in those instances sought to expand their authority to encompass police investigative powers; here, the ancillary authority possessed by parole agents is not one predicated on criminal investigation. Instead, the Commonwealth continues, the agents merely seek to ensure their own safety and that of others present, in the course of the duties, which mirrors the rationale employed in *Terry*. *See Terry*, 392 U.S. at 26, 88 S. Ct. at 1882 (explaining that a *Terry* search is a limited intrusion "necessary for the discovery of weapons which might be used to harm the officer or others nearby").

In terms of parole agent safety, the Commonwealth echoes the Superior Court's reasoning that agents face dangers similar to police officers, justifying the protections

afforded by protective searches.  *See Barnes*, No. 15149, 1996 WL 501464, at *4; *see also Rios*, 122 Cal. Rptr. 3d 96; *Jones*, 78 So. 3d 274.  The Commonwealth develops that holding otherwise would place agents at risk like police officers, but without any mechanism to preclude violent confrontation in the face of apparent danger.  Accordingly, the Commonwealth argues that parole agents' authority should be accompanied by the ancillary power to frisk non-offenders who are present in the parolee's home when there is reasonable suspicion that the person is armed.

Our view of parole agents' authority to engage in protective frisks of non-offenders encountered in the scope of their duties substantively overlaps with the safety-based rationale advanced by the Superior Court in this matter.  In this respect, we initially agree that the plain language of Sections 6152 and 6153 of the Parole Code generally delineates the supervisory relationship that parole agents have with offenders, but does not otherwise reveal a legislative intent to "empower parole agents to act as police officers with respect to non-offenders or private citizens."  *Mathis*, 125 A.3d at 785; *see also Commonwealth v. Wright*, 609 Pa. 22, 48, 14 A.3d 798, 814 (2011) (citing 1 Pa.C.S. §1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.")).

However, the Parole Code imposes a number of duties upon agents, including supervision of offenders in a manner that will assist in their "rehabilitation and reassimilation into the community and . . . protect the public."  61 Pa.C.S. §6153(a).  As the Commonwealth observes, in order to satisfy these statutory duties, parole agents, among other things, conduct routine, unannounced home visits, as in this case, thus risking exposure to a variety of potentially dangerous unknowns.  In this respect, we find persuasive, as did the Superior Court, the perspective developed by other jurisdictions.

Once we recognize the authority of parole officers to search parolees and their premises, . . . we cannot ignore the hazards involved in this kind of public duty. A bullet's message is deadly no matter who the sender is. A law-enforcement officer in a potentially perilous situation must have a basic right of self-protection notwithstanding the shape of his badge. As long as an officer is properly pursuing his lawful duty, the only issue "is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety . . . was in danger."

*People v. Thompson*, 353 N.Y.S.2d 698, 702 (N.Y. Sup. Ct. 1974) (second alteration in original) (citation omitted) (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883); *see also Barnes*, No. 15149, 1996 WL 501464, at *4; *Rios*, 122 Cal. Rptr. 3d at 110.[8]

Moreover, as intimated by the *Rios* court, *see id.*, interactions with non-offenders are inherent in parole enforcement activities. For example, parolees are commonly prohibited from associating with persons who have been convicted of certain offenses, which in turn may suggest that parole agents are authorized to inquire as to the identity of non-offenders present during a home visit for the purpose of ascertaining compliance with parole conditions. *See, e.g.*, N.T., July 28, 2014, at 23 (Agent Welsh noting that the parolee in this case was prohibited from keeping the company of persons convicted of drug or weapons offenses); *Commonwealth v. Brown*, 240 Pa. Super. 190, 195, 361

---

[8] It is also notable that, in some jurisdictions, persons who reside with a parolee are deemed to have a diminished expectation of privacy as to parole searches of areas of the home in which the parolee has common control. *See State v. Johnson*, 748 P.2d 1069, 1073 (Utah 1987) ("A warrantless search of a parolee may result in an invasion of privacy, at least to some extent, for those living with the parolee. If the Fourth Amendment rights of nonparolees living with parolees were not reduced, a parolee could avoid all warrantless parole searches by living with a nonparolee and asserting the nonparolee's constitutional rights, and thus emasculate one significant feature of the parole system." (footnote and citations omitted)), *abrogated on other grounds*, *State v. Doporto*, 935 P.2d 484 (Utah 1997). This concern is lessened in Pennsylvania in instances where the Board of Probation and Parole requires a "Home Provider Agreement," consenting to searches of common areas based on reasonable suspicion, executed by cohabitants prior to approving the parolee's living arrangements. *See, e.g.*, *Commonwealth v. Smith*, 85 A.3d 530, 535 (Pa. Super. 2014) (discussing such an agreement in the context of the consent exception to the Fourth Amendment).

A.2d 846, 848 (1976) ("Conditions established by the Board [of Probation and Parole] include . . . the responsibility to . . . avoid 'undesirable' companions . . .."). Accordingly, although ancillary aspects of a parole agents' duty are not expressly referenced in the legislation, they nonetheless derive directly from their statutorily imposed functions. In this way, these corollaries may be viewed as reflecting the "special needs" that warrant deviations from traditional constitutional precepts in the parole enforcement realm. *Griffin v. Wisconsin*, 483 U.S. 868, 873-74, 107 S. Ct. 3164, 3168 (1987) ("A [s]tate's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.").

As to parole agents' designation as peace officers, in addition to their circumscribed common law arrest powers, *see generally* 5 AM. JUR. 2d *Arrest* §40 ("[A] peace officer may arrest [on] reasonable suspicion of felony, whether or not any felony was actually committed . . .."), they are statutorily empowered to employ deadly force for self-protection or protection of another and in the course of making an arrest "when [the officer] believes that such force is necessary to prevent death or serious bodily injury to himself or such other person." 18 Pa.C.S. §508(a)(1). In this respect, it is also notable that parole agents are sanctioned to carry firearms in performing their duties. *See* 37 Pa. Code §69.1-.3.

Accordingly, innate to these common law and statutory authorizations is the power to undertake constitutionally permissive actions that may preempt resort to the use of deadly force. In other words, an agent's authority to use force includes the power to prevent violent confrontation in the first instance, as it "would be anomalous to hold that parole officers may carry weapons like peace officers, place themselves in peril like peace officers, and conduct lawful arrests like peace officers, yet not protect

themselves in the face of apparent danger." *Barnes*, 1996 WL 501464, at \*4; *see also State v. Armstrong*, No. 98-1441, 2000 WL 204051, at \*3 (Iowa Ct. App. Feb. 23, 2000) (unpublished) ("We believe . . . a peace officer conducting a pat-down search for weapons, consensual or otherwise, is acting under the general authority of a peace officer." (citations omitted)).

In terms of previous decisions of this Court finding that various officials had exceeded their statutory authorization, the Commonwealth accurately notes that they are distinguishable as pertaining to limitations on officials' criminal investigative powers. The nature of a *Terry* frisk is materially different in both scope and purpose from an investigative search for evidence of criminality, since a protective pat-down is "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search." *Terry*, 392 U.S. at 26, 88 S. Ct. at 1882. "The purpose of a limited search after a temporary detention is not to discover evidence of crime but to allow the peace officer to pursue investigation without fear of violence." *Perez v. State*, 548 S.W.2d 47, 49 (Tex. Crim. App. 1977) (citations omitted). Critically, the *Terry* decision did not depend on any express legislative grant of search powers; rather, the United States Supreme Court weighed the government interest in protecting officers from the risks attendant to performing their duties against an individual's right to be free from intrusion. *See Terry*, 392 U.S. at 23-26, 88 S. Ct. at 1881-82.[9] In this regard, private citizens'

---

[9] This weighing analysis is distinguishable from that employed in the criminal investigative context as pertains to the government interest involved. *See Commonwealth v. Blystone*, 519 Pa. 450, 462, 549 A.2d 81, 86 (1988) ("[T]he [Wiretapping and Electronic Surveillance Control Act] strikes a balance between citizens' legitimate expectation of privacy and the needs of law enforcement officials to combat crime."), *aff'd sub nom. Blystone v. Pennsylvania*, 494 U.S. 299, 110 S. Ct. 1078 (1990).

Fourth Amendment rights remain substantively unaltered pursuant to our view of parole agents' authority to ensure their own safety, since any intrusion must be justified by reasonable suspicion, the same standard restricting intrusions by police officers.

Thus, although strict statutory interpretation may be appropriate in assessing the boundaries of criminal investigative powers pursuant to legislative enactments, *see Kopko*, 586 Pa. at 193, 892 A.2d at 779 (citation omitted),[10] a parole agent's authority to conduct a weapons frisk of non-parolees instead attends the agents' statutory duty to effectively supervise parolees and is grounded in the powers concomitant to their peace officer designation. *See* 61 Pa.C.S §6152 ("An agent is declared to be a peace officer . . ..").

As for the *Scott* decision, we agree with the Superior Court's assessment that the case is factually distinguishable insofar as there was no basis for the probation officers to believe that the nephew posed a threat to anyone's safety. *Accord Mathis*, 125 A.3d at 786-87. In any event, Superior Court decisions are not binding on this Court. *See Craley v. State Farm Fire & Cas. Co.*, 586 Pa. 484, 498 n.13, 895 A.2d 530, 538 n.13 (2006).

Accordingly, we conclude that parole agents have the authority to conduct a protective *Terry* frisk of non-parolees within the course of executing their statutorily imposed duties, so long as reasonable suspicion supports the agents' conduct.

Turning to whether Agent Welsh possessed reasonable suspicion to justify the protective frisk in the present circumstances, Appellant notes that a *Terry* frisk requires

---

[10] Parenthetically, this asserted strict-interpretation view is arguably in tension with the liberal construction applied in determining the jurisdictional parameters of other statutorily empowered state actors. *See Commonwealth v. Lehman*, 582 Pa. 200, 203-04, 870 A.2d 818, 820 (2005) ("[T]he [Statewide Municipal Police Jurisdiction Act] should be liberally construed to achieve its purposes . . ..").

the officer to identify "specific and articulable facts" that indicate criminality is afoot, *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880, while also demonstrating a legitimate fear for officer safety, *see Commonwealth v. Rodriguez*, 532 Pa. 62, 73-74, 614 A.2d 1378, 1383-84 (1992) (citation omitted). He argues that the focus of the inquiry is on the actions of the defendant, rather than the surrounding circumstances or associates. *See Commonwealth v. Maxon*, 798 A.2d 761, 768 (Pa. Super. 2002).

As for criminal conduct, Appellant posits that, since Agent Welsh did not observe any active use of marijuana, the smell alone did not provide reasonable suspicion. Further, he emphasizes that the nervous behavior identified by Agent Welsh is not indicative of criminal activity. *See Commonwealth v. Tam Thanh Nguyen*, 116 A.3d 657, 668-69 (Pa. Super. 2015). Appellant forwards that his conduct, including his cooperativeness throughout the encounter, was inapposite to criminality.

Regarding agent safety concerns, Appellant explains that a person's potential possession of illicit drugs and nervousness have both been rejected as factors suggestive of an individual's dangerousness. *See Commonwealth v. Grahame*, 607 Pa. 389, 400-01, 7 A.3d 810, 816 (2010); *Commonwealth v. Cartegena*, 63 A.3d 294, 305-06 (Pa. Super. 2013) (*en banc*). Further, Appellant advances that a general description of a bulge will not support an inference of a perceived danger; instead, decisional law has required an officer to provide specific details. *See, e.g.*, *Commonwealth v. Carter*, 105 A.3d 765, 774-75 (Pa. Super. 2014) (*en banc*). In this respect, he notes that Agent Welsh could not positively identify what the bulge was prior to the frisk. From Appellant's perspective, Agent Welsh had only minimal interaction and offered no specificity as to his belief that Appellant was armed.

The Commonwealth responds that Agent Welsh had reasonable suspicion to believe that criminality was afoot and that Appellant presented a danger to the agents'

safety based on the following facts: the residence's location in a high-crime area; the strong odor of marijuana throughout the home; the marijuana roaches in the ashtray; Appellant's nervous pacing, unease, and broken eye contact; his nervous and broken speech; the furtive manner in which Appellant picked up and carried his jacket; the bulge in the jacket; and the way in which Appellant turned away from Agent Welsh as he exited the kitchen. The Commonwealth emphasizes that these circumstances must be assessed together in totality, as opposed to Appellant's individualized approach. Agent Welsh's seven years of experience as a state parole agent are also highlighted by the Commonwealth. Further, the Commonwealth observes that Appellant's claim that Agent Welsh's uncertainty with respect to whether the bulge was a weapon is immaterial in light of this Court's explanation that absolute certainty is not required. *See Commonwealth v. Cortez*, 507 Pa. 529, 533, 491 A.2d 111, 113 (1985).

Due to the incremental manner in which Agent Welsh's safety concerns developed and his interactions with Appellant, a preliminary assessment of the point at which Appellant was detained is necessary to determining whether reasonable suspicion justified the seizure and frisk.

In fixing the moment at which a detention has occurred, "the pivotal inquiry is whether, considering all the facts and circumstances evidencing the exercise of force, a reasonable [person] would have thought he was being restrained." *Commonwealth v. Mendenhall*, 552 Pa. 484, 489, 715 A.2d 1117, 1120 (1998) (citing *Commonwealth v. Jones*, 474 Pa. 364, 373, 378 A.2d 835, 840 (1977)); *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980) ("[A] person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). In *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884 (2000), the Court set forth a non-

exhaustive list of factors deemed relevant in assessing whether a seizure has occurred: the presence of police excesses; physical contact with the suspect; police direction of the subject's movements; the demeanor of the officer; the location of the confrontation; the manner of expression directed to the citizen; and the content of statements or interrogatories. *See id.* at 72-73, 757 A.2d at 897-98 (citations omitted). *Strickler* cautioned, though, that no single factor dictates the ultimate conclusion as to whether a detention occurred, *see id.* at 59, 757 A.2d at 890, and this Court has recognized that the line between a mere encounter, which requires no suspicion, and an investigative detention, "cannot be precisely defined 'because of the myriad of daily situations in which police[] and citizens confront each other on the street.'" *Mendenhall*, 552 Pa. at 490, 715 A.2d at 1120 (quoting *Jones*, 474 Pa. at 371, 378 A.2d at 839). Ultimately, it is the "nature of the confrontation" that informs the assessment of the totality of the circumstances. *Commonwealth v. Lewis*, 535 Pa. 501, 509, 636 A.2d 619, 623 (1994).

Pursuant to the above framework, and viewing the largely undisputed facts in the light most favorable to the Commonwealth, *see D'Amato*, 514 Pa. at 482, 526 A.2d at 305, a reasonable person in Appellant's situation would not feel that he was restrained from leaving throughout the initial encounter. Appellant was left alone in the kitchen with clear access to an exit while the agents focused their attention on the parolee in another room. When Agent Welsh spoke with Appellant, it was in a conversational tone, and he made polite requests explained in terms of ensuring safety. *See Commonwealth v. Stubblefield*, 413 Pa. Super. 429, 437, 605 A.2d 799, 802 (1992) (indicating that an officer's inquiry addressed in a conversational tone reflects a mere encounter). Further, at no time did either agent give the impression that Appellant was suspected of any wrongdoing, despite the smell of marijuana permeating throughout the home. *See Commonwealth v. Martin*, 705 A.2d 887, 891 (Pa. Super. 1997) ("A

statement by a law enforcement official that a person is suspected of illegal activity is persuasive evidence that the Fourth Amendment [has] been implicated.").

Agent Welsh's statement that he sought to get Appellant out of the house "as soon as I possibly can" and his request that Appellant move to the front room, N.T., July 28, 2014, at 9, might reasonably be construed as implying that the agent was not *yet* permitting Appellant to leave.[11]   Nevertheless, given the context and nature of the limited, non-confrontational interaction to that point, that sole potential inference does not transform the encounter into a seizure, particularly as Appellant noted that Agent Welsh was merely communicating urgency for him to leave.  *See Mendenhall*, 552 Pa. at 489–90, 715 A.2d at 1120 (reasoning that the officer's instruction to the driver to "stick around," while evidencing a demonstration of authority, did not result in a detention, since the motorist was otherwise permitted to freely move around and in and out of the vehicle); *Martin*, 705 A.2d at 891 (explaining that a police officer's request to a suspected drug dealer to move outside of a restaurant for questioning, performed in a "non-threatening manner" and in the absence of coercion or intimidation, did not constitute a seizure (citing *Sibron v. New York*, 392 U.S. 40, 88 S. Ct. 1889 (1968))).

In this regard, all interactions with law enforcement may be viewed, to some degree, as a show of authority to which people usually accede.  However, the free-to-leave test is not to be employed in such a literal manner so as to require application of Fourth Amendment exclusionary remedies to all police encounters.  As one commentator explains,

> Implicit in the introduction of the [officer] and the initial questioning is a
> show of authority to which the average person encountered will feel

---

[11] As Agent Welsh further explained, he intended to ask Appellant for identification once in the front room.  *See* N.T., July 28, 2014, at 23.  The agent, however, did not make this known to Appellant.

obliged to stop and respond. Few will feel that they can walk away or refuse to answer. . . . Thus, if the ultimate issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The *Mendenhall-Royer* standard should not be given such a literal reading as to produce such a result. . . . Rather, the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse.

*See* Wayne R. LaFave, 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §9.4(a) (5th ed. 2016) (quotation marks and footnotes omitted).

Thus, and reviewing the facts favorably to the Commonwealth, Appellant was not detained until Agent Welsh reached out and seized the jacket. Turning to whether, at that time, Agent Welsh's actions were justified, we agree with the Commonwealth that the underlying facts establish reasonable suspicion that Appellant posed a danger to the officers.[12] Most notably, Appellant displayed nervous behavior and speech, and the agent observed him carefully cradling a jacket containing a prominent bulge approximately the size, and potential shape, of a handgun. As Appellant moved, he angled himself in a manner calculated to conceal the jacket from the agent. Under these circumstances, the agent was justified in investigating further in order to ensure that the object was not a firearm. Although Appellant correctly notes that some of the considerations recited above, when viewed in isolation, would not support a *Terry* frisk, he fails to appreciate that inferences may be drawn by evaluating these items

---

[12] Although Agent Welsh testified that, in addition to safety reasons, he intended that Appellant not leave the residence with drugs, *see* N.T., July 28, 2014, at 31, this subjective alternative basis for the frisk does not invalidate the protective search, since the agent articulated objective, permissible grounds for the intrusion. *See Ohio v. Robinette*, 519 U.S. 33, 38, 117 S. Ct. 417, 420-21 (1996) ("[T]he fact that an officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (alteration omitted) (quoting *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996))).

collectively. *See Commonwealth v. Cook*, 558 Pa. 50, 58, 735 A.2d 673, 677 (1999) (citations omitted). When so assessed, the specific facts articulated by the officer warranted his belief that Appellant may have posed a threat to the safety of the officer and others within the residence. *Accord Mathis*, 125 A.3d at 790-91.[13] That being the

---

[13] To the extent Appellant argues that a *Terry* frisk in this context also requires reasonable suspicion that the subject is engaged in criminality, such suspicion was present in this case. By the time of the seizure, the agent had developed individualized reasonable suspicion that Appellant may be harboring contraband related to the evidence of recent marijuana use and/or a weapon. *See* N.T., July 28, 2014, at 11 (describing that, when Appellant picked up his coat, he held it "like it was a baby [with] a protecting type of grip," and noting that his nervous behavior, the manner in which he was turning away from the agent as he walked, and the bulge in his jacket raised the agent's suspicions that he may have been "trying to remove contraband [or] has something that could be unsafe to my partner or my offender").

Given that the agent possessed reasonable suspicion of both danger and criminality, we need not determine whether, or under what circumstances, a parole agent -- who is lawfully inside a private residence, in the performance of official duties, and reasonably concerned about safety -- may perform a weapons frisk of a non-parolee, even in the absence of reasonable suspicion of criminality. This issue would be more sharply presented in a case where the suspicion related to danger alone.

Contrary to Justice Wecht's proffer that the two-tiered *Terry* analysis is inviolable, *see* Dissenting Opinion, *slip op.* at 7 n.9 (Wecht, J.), courts have acknowledged that there are circumstances in which protective police actions predicated on *Terry* principles do not require a suspicion of criminality. *See, e.g.*, *Commonwealth v. Narcisse*, 927 N.E.2d 439, 445 n.6 (Mass. 2010) ("There are, of course, circumstances other than consensual encounters in which police officers may pat frisk a person in the absence of a reasonable suspicion that the person is (or has been) engaged in criminal activity." (citing, *inter alia*, *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093 (1990)); *see also* *United States v. Flippin*, 924 F.2d 163, 166 (9th Cir. 1991) ("When the police have lawfully entered a dwelling and have a reasonable suspicion that a suspect is armed, a *Terry* pat down for weapons is permissible."). Indeed, the two United States Supreme Court cases cited in Justice Wecht's dissent relative to this discrete matter, *see* Dissenting Opinion, *slip op.* at 7 n.9 (Wecht, J.), highlight pertinent considerations that may, in the proper situation, support a frisk absent individualized reasonable suspicion of criminality.

(continued…)

case, and in light of the suspicion of criminality, *see supra* note 13, the officer's actions did not violate Appellant's constitutional rights.

Accordingly, the order of the Superior Court is affirmed.

Justices Baer, Todd and Mundy join the opinion.

Justice Dougherty files a dissenting opinion in which Justice Donohue joins.

Justice Wecht files a dissenting opinion.

---

(…continued)

In *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781 (2009), for example, the Court effectively waived the requirement of reasonable suspicion of criminality relative to automobile passengers. *See id.* at 326-27, 129 S. Ct. at 784. The Court reasoned as follows:

> [Although], in a lawful traffic stop, there is probable cause to believe that the driver has committed a minor vehicular offense, . . . there is no such reason to stop or detain the passengers. On the other hand . . . the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.

*Id.* at 331-32, 129 S. Ct. at 787 (citations and quotation marks omitted). Such a rationale could arguably be employed when considering the encounters that occur between non-parolees and parole agents during a home visit, particularly when viewed in reference to the Supreme Court's acknowledgement that in-home confrontations present a particularized danger. *See, e.g., Buie*, 494 U.S. at 333, 110 S. Ct. at 1098 (explaining that in-home encounters are as, or more, dangerous than on-the-street or roadside confrontations, since the officer is on the adversary's "turf" and in a confined setting of unknown configuration).

In any event, as already emphasized, the present factual circumstances do not require resolution of such considerations.